**Michael JOHNSON, Plaintiff,**

v.

**JOS. SCHLITZ BREWING COMPANY
and United Steelworkers of America,
AFL–CIO, Defendants.**

**Civ. No. C–81–226–WS.**

United States District Court,
M.D. North Carolina,
Winston-Salem Division.

Feb. 13, 1984.

Harvey L. Kennedy, Winston-Salem, N.C., for plaintiff.

M. Ann Anderson, W. Andrew Copenhaver, and David A. Irvin, Winston-Salem, N.C., for Schlitz.

Charles B. Merryman, Jr., Charlotte, N.C., Robert H. Stropp, Jr., Birmingham, Ala., for Union.

## MEMORANDUM OPINION

BULLOCK, District Judge.

Plaintiff, Michael Johnson, brought this action against his former employer, Jos. Schlitz Brewing Company ("Schlitz" or the "Company"), and his former union, the United Steelworkers of America (the "Union" or the "Steelworkers"), alleging damages stemming from his discharge by Schlitz on December 11, 1979.

This case was tried without a jury on October 31 and November 1, 2, and 3, 1983.

Following this court's grant of portions of Defendant Schlitz's motion for partial summary judgment on July 18, 1983, the issues remaining for trial regarding Defendant Schlitz were Plaintiff's claim that his discharge was in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a) and (c) and 42 U.S.C. § 1981; and his claim that his discharge was a breach of Schlitz's contract with the Steelworkers in violation of 29 U.S.C. § 185.

The issues for trial regarding the Defendant Union were two, both allegedly grounded in 29 U.S.C. § 185. First, whether the Union breached the collective bargaining agreement by failing to follow contractual grievance procedures; and second, whether the Union breached its statutory duty under 29 U.S.C. § 159(a) of "fair representation." A directed verdict was granted on these issues for the Union at the close of the Plaintiff's evidence.

## Findings of Fact

1. Plaintiff is a black citizen of the United States and is a resident of Winston-Salem, North Carolina. The Defendant Union is an unincorporated association and a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152. Defendant Schlitz was, at the time of Plaintiff's employment, a corporation duly organized and existing under the laws of the State of Wisconsin. Schlitz is an employer within the meaning of 42 U.S.C. § 2000e(b).

2. The Plaintiff, Michael Johnson, was hired by the Defendant, Jos. Schlitz Brewing Company, as a strap operator in its Winston-Salem facility in March 1976. In April 1976 he was promoted to a front-end adjuster. In February 1978 he was promoted to the position of front-end maintainer, which is a Labor Grade 10 position. (Labor Grade 12 is the highest grade at Schlitz.) Plaintiff remained in this position until his termination in December of 1979.

3. Plaintiff, a veteran of the United States Navy, informed Schlitz at the inception of his employment that he was a disabled veteran and would have to miss work periodically to obtain medical treatment. This treatment required trips of varying duration to various Veterans Administration Hospitals.

4. The Schlitz plant operates on a "4–3–3–4" system. Employees work four days the first week, three the second, three the third, and four days the fourth. The plant operates on a 24 hour, seven day per week basis, producing five to six million empty beer cans per day.

5. Under Schlitz's Punctuality and Attendance Program, graduated penalties are provided for the receipt of employee demerits. When an employee has four to six demerits, he is given a verbal warning. Seven to nine and a half demerits results in a written warning; ten to twelve in a one to three day suspension; and thirteen to fifteen in a five to ten day suspension. Under company policy, sixteen demerits results in discharge. Under the Schlitz program, certain absences within a designated time period are "free" and result in no demerits. Three demerits can be removed if the employee goes three months without a demerit.

6. Schlitz's Punctuality and Attendance Program also sets forth the requirements for a doctor's statement for verification of illness. The excuse must contain: (1) the diagnosis; (2) the days off sick, (3) the date the employee can return to work, (4) the date the statement was given, and (5) the doctor's signature. Plaintiff was familiar with the Program.

7. Plaintiff had problems with demerits beginning shortly after his employment with Schlitz. In July 1976, Plaintiff received a verbal warning for excessive absences. At this point he had 4½ demerits. In November 1976, Plaintiff again received a verbal warning, as five demerits appeared on his record. In March 1977, Plaintiff again received a verbal warning. Four additional demerits were the cause of this warning. In August 1977, Plaintiff received a written warning for "excessive absenteeism." At this point his record reflected 8½ demerits.

8. Plaintiff's attendance problems continued. In January 1978, he received his first suspension. Plaintiff then had a total of ten demerits. In May 1978, Plaintiff received another written warning as the result of an additional absence. A suspension was not warranted because Plaintiff's total of demerits had fallen to 9½. This was because of the Schlitz policy which deducted three demerits for each three-month period during which an employee worked without any chargeable demerits.

9. By October 1978, Plaintiff had again reached the level of ten demerits. The court can find no record of a suspension at this stage, however.

10. The ebb and flow of Plaintiff's tide of demerits continued. In April 1979, Plaintiff received another written warning, with his demerit total then standing at 8½. In May 1979, Plaintiff received a two-day suspension. His total number of demerits was twelve. On August 16, 1979, Plaintiff received a seven-day suspension. His total number of demerits was then 18½. Six and one-half demerits had been assessed as the result of his lateness on August 2 and. unexcused absences on August 3 and 4. The assessment of these demerits is an integral portion of Plaintiff's disparate treatment claim.

11. On July 26, 1979, Plaintiff was injured in a non-work related accident when he fell down some stairs, and did not work from July 26 to August 2. On August 2, Plaintiff presented a medical excuse to Allen Thompson, Assistant Director of Industrial Relations, stating "may return to work Thursday, 8/2/79." Plaintiff said, however, that he could not work that day. Thompson informed the Plaintiff that if he did not work that day, he "had better have a valid medical excuse." Plaintiff did not work August 2, 3, and 4, and was assessed demerits for those days.

12. Plaintiff claimed he was being treated at the VA Hospital in Durham, North Carolina, on those days, and he presented a written excuse signed by a Dr. Timothy Ward, dated 6/8/79 [sic], which stated that Johnson "was being followed Thurs-Friday & Saturday of last wk." Thompson, through Plaintiff's supervisor, Ray Connell, requested that Plaintiff clear up the ambiguity about the date and substantiate the excuse particularly regarding the use of the term "followed." Thompson's own efforts to contact Dr. Ward were unsuccessful.

13. Plaintiff subsequently presented another medical excuse from Dr. Ward, who, Plaintiff claimed, had been transferred to the Womack Army Hospital in Fayetteville, North Carolina. This excuse read, in pertinent part, "Mr. Johnson was seen by me on 8/6/79 in VA clinic." VA records, however, do not reflect Plaintiff's presence at the clinic on any of the disputed August dates. Management did not accept this excuse, and the questioned demerits were never removed from Plaintiff's record.

14. During a visit to the VA Hospital, Plaintiff was fitted with a leg brace. It was Plaintiff's understanding that he was to wear this brace only when he felt it was necessary, depending on personal comfort.

15. Ray Connell and Frank Abramo, another supervisor, harassed Plaintiff regarding his use of the brace. Both men would raise Plaintiff's pants leg or kick his leg to determine whether he was wearing the brace.

16. On October 3, 1979, Connell discovered Plaintiff in the first aid room applying ice to his ankle. Plaintiff was not wearing his brace. Connell informed Plaintiff that it was the company's understanding that Plaintiff was required to wear the brace. After a discussion with Industrial Relations, Plaintiff was allowed to work the balance of his shift, but was told he was to wear the brace at all times, pending further word from the VA. Allen Thompson agreed to call the VA to verify Plaintiff's story.

17. The next day, October 4, Plaintiff appeared for work without his brace. Connell sent Plaintiff home to get it, since Thompson's call to the VA had not substantiated Plaintiff's story. Plaintiff called Connell and informed him that he could not

find the brace. Plaintiff later returned to work and was suspended for a two day period.

18. In a letter dated October 15, 1979, Plaintiff was informed by the VA that he could work without wearing his brace. He delivered this letter to Industrial Relations.

19. Plaintiff received no demerits for not wearing his brace.

20. As a result of the two-day suspension, and an additional one-half demerit later incurred for tardiness, management placed Plaintiff in a restricted absence program. At this time Plaintiff had 21½ demerits, more than enough for his discharge. Plaintiff was informed that over the next three months no tardiness or absence would be accepted. It was unclear whether a valid medical excuse would have been accepted under the program.

21. On the evening of December 2, 1979, Plaintiff reported for work as scheduled. After working approximately fifteen minutes, Plaintiff informed his supervisor, Ray Connell, that he was suffering from hemorrhoids and asked permission to leave work. Connell told Plaintiff to see a doctor and bring back a medical excuse. Plaintiff returned home and saw his doctor the next morning, December 3. Dr. O.G. Hairston prescribed warm baths and ointments for Plaintiff and gave him a medical excuse authorizing his return to work on December 4. Plaintiff spent the entire afternoon of December 3 taking warm baths, and felt well enough to return to work that evening. The restricted absence program played a conscious role in his decision.

22. Upon his return to work, Plaintiff was met by his supervisor, Ray Connell. Connell examined Plaintiff's note, stated that he did not believe it and told Plaintiff that "as far as he was concerned Plaintiff was fired and should get in touch with personnel."

23. Plaintiff returned to the plant for his regular shift on December 4 and was told by personnel to work. At this point, Plaintiff's hemorrhoids had cleared up.

24. Allen Thompson spoke with Dr. Hairston on December 4. As a result of that conversation, he had reservations about accepting Plaintiff's medical excuse. Thompson then met with Paul Hoeing, Director of Industrial Relations, and both men decided to send Plaintiff to the company physician, Dr. Duncan Cater, to substantiate his claim. Plaintiff was informed of this decision at a meeting after his shift concluded on December 4, and reluctantly agreed to be examined by Cater. Union representatives also attended the meeting.

25. Plaintiff was examined by Cater on December 6. Cater's report to Schlitz indicated that there was no evidence of external or internal hemorrhoids. Plaintiff testified, however, that at this time he was still suffering from pain, itching, and bleeding. Cater recommended that Plaintiff be examined by a gastroenterologist.

26. Plaintiff met with management on December 7 to discuss the results of this examination. Hoeing and Thompson informed the Plaintiff that Cater had found no evidence of hemorrhoids. On December 10, Plaintiff met again with management and union representatives. The parties agreed that Plaintiff would be sent to a third doctor for evaluation. Plaintiff consented to the third examination, which was to be performed by Dr. James Gibbs.

27. Plaintiff appeared for his appointment with Dr. Gibbs on December 11, but refused to be examined. Gibbs testified, however, that it would have been possible to see residual evidence of hemorrhoids on December 11 that Plaintiff had suffered from on December 4. On December 11, Plaintiff was terminated.

28. Plaintiff subsequently took the matter of his discharge to arbitration, where he was represented by a union attorney. Plaintiff met for the first time with the union attorney on the evening before the arbitration hearing. During the half-hour meeting, Plaintiff explained his side of the story and suggested a list of witnesses to the attorney, specifying that Dr. Hairston be called. Hairston did not testify at the hearing and was never requested to do so

by the union attorney. Plaintiff presented no other evidence of the attorney's preparation or his lack thereof. The arbitrator found for Schlitz, and Plaintiff instituted this action. Plaintiff contends that the union attorney's conduct was in breach of the Union's duty of fair representation.

29. Central to Plaintiff's claim of discrimination was his allegation that white employees who presented deficient medical excuses were not issued demerits. Plaintiff's counsel presented the files of eight white employees which substantiated this allegation. Plaintiff had subpoenaed over 150 files, however, out of 470 employees, and was able to turn up only eight excuses which had apparently "slipped through the net." In addition, Allen Thompson was not administering the attendance program at this time. No deficient excuses accepted from white employees were introduced from the period after Thompson was placed in control of the program.

30. While Plaintiff claimed that white employees with worse attendance records than his were not discharged, no specific attendance records were introduced into evidence, despite the fact that Plaintiff's counsel engaged in extensive discovery.

31. Plaintiff's attempts to link his discharge to racial discrimination revolve largely around racial slurs made by his supervisor, Ray Connell. Plaintiff's own testimony concerning the frequency of Connell's racial barbs is conflicting, however. When questioned about the times Connell had used the word "nigger," Plaintiff in his deposition testified to only two instances. The first was to Connell's statement "that's just like a nigger" when Plaintiff failed to complete a job quickly. The second was that Plaintiff had heard that Connell had said that he was going "to get all the niggers off his line." Deposition of M. Johnson at 66, 78. Plaintiff's testimony at the arbitration hearing also minimized the frequency of racial slurs. There Plaintiff testified regarding Connell's actions towards him, "I don't know if it was a prejudice type deal. I've never been out of the way with anybody as far as

that's concerned." Arbitration Transcript at 148. At trial, however, Plaintiff testified that Connell had called him "nigger" nearly every day. Plaintiff's enhanced memory of the frequency of these epithets is unexplained.

32. An additional instance when Connell had used this phrase was testified to by both parties at trial. Both agreed that Connell had said to Plaintiff, "I don't know no niggers." Plaintiff claimed this was in response to his question "You don't know many black people, do you?" Connell, however, stated that this was his rejoinder to Plaintiff's statement that "you know how us niggers are."

33. Connell's personnel file contains not a single complaint by an employee that his actions or attitudes are racially motivated.

34. The court finds that Connell did occasionally refer to Plaintiff as a "nigger" but that this was not an every-day occurrence. This finding is bolstered by the testimony of Billy Jones and Marlene Blakney regarding Connell's attitude toward blacks.

35. Billy Jones, an operator in the Schlitz plant, testified that Connell had told him to "get his black ass back to work." Jones also overheard Connell refer to him as a "smart black s.o.b."

36. Marlene Blakney, a former strapper operator at Schlitz, testified regarding general harassment by white co-workers. Blakney was also the recipient of a crude drawing of a monkey with the word "Blackney" written beneath it. Connell told her to "forget it" when she complained to him about this. The court finds, however, that much of the harassment directed at Blakney was the result of personal dislike rather than racial discrimination.

37. William Schley, chairman of Schlitz's Civil Rights Committee, stated that his committee had received numerous complaints regarding all the white supervisors in the plant, including Connell. Schley could point to no specific instances, however.

38. At the close of Plaintiff's evidence, the court granted the Defendant Union's Rule 41(b) motion.

## Conclusions of Law

A. Plaintiff's Claims Against the Union.

1. The conduct which Plaintiff complains of is the Union's failure to heed his request to file a grievance when he was placed in the restricted absence program, its consent to Plaintiff's undergoing of a second and third examination for hemorrhoids, and the Union's representation at the arbitration hearing. This court will consider only the Union's conduct at the arbitration hearing. Any prior conduct by the Union is not actionable since it is beyond the six-month statute of limitations. *DelCostello v. International Bhd. of Teamsters,* — U.S. —, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).[1]

■■■ 2. Plaintiff's contention that the Union breached its duty of fair representation was disposed of when the court granted the Defendant Union's motion for dismissal under Fed.R.Civ.P. 41(b) at the close of the Plaintiff's evidence. It is well settled that this duty is breached only where the Union's conduct is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). *See Hardee v. North Carolina Allstate Services, Inc.,* 537 F.2d 1255, 1258 (4th Cir.1976). In other words, Johnson must prove that the union representatives were "so indifferent to the rights of members or so grossly deficient in [their] conduct purporting to protect the rights of members that the conduct could be equated with arbitrary action." *Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888, 891 (4th Cir.1980).

■■■ 3. Plaintiff's central complaint regarding the arbitration hearing is that the union attorney was inadequately prepared and did not call appropriate witnesses. At the outset, this court must note that the Union was not even under a duty to take Plaintiff's claim to arbitration. *Vaca, supra,* 386 U.S. at 191, 87 S.Ct. at 917. Having done so, however, the Union is bound by the duty of fair representation. This court cannot find that duty to have been breached. While Plaintiff complains about the time the union attorney gave him to present his claim, a half hour to explain some relatively simple circumstances is not an unreasonable amount of time. Nothing else appearing, the court will not second-guess the arbitration strategy of the union attorney. There is nothing in the Plaintiff's evidence sufficient to establish even a semblance of bad faith conduct or "gross indifference" to Johnson's claim on behalf of the Union attorney.

■■■ 4. It is true that the union attorney did not call some of the witnesses that Plaintiff had requested. Plaintiff claims that Dr. Hairston's testimony would have been determinative of his wrongful discharge. A similar contention that the failure to call a requested witness was a breach of the duty of fair representation was rejected by the Fourth Circuit in *Hardee, supra.* This court sees no reason in the present case to diverge from that holding. This is particularly true since Schlitz never questioned that Dr. Hairston diag-

---

1. The complaint in this action was filed on October 23, 1980. Plaintiff was placed in the restricted absence program in October 1979, and the referrals to physicians which Plaintiff complains of occurred in December 1979. *Delcostello* is to be applied retroactively. *Murray v. Branch Motor Express Co.,* 723 F.2d 1146 (4th Cir.1983). In his complaint Plaintiff alleged "that the Defendant Union failed to follow the grievance procedures as outlined in Article 6 of the Collective Bargaining (sic) from Step 1 through Step 3 of said procedure. That the Union waived Plaintiff's contractual rights during the grievance process without his consent, and that the Union agreed to new requirements not contained in the Collective Bargaining Agreement in an effort to circumvent said Agreement." The Plaintiff did not offer the pertinent provisions of the collective bargaining agreement into evidence and therefore the court cannot determine any alleged violation of the provisions. However, the only evidence which the Defendant offered at the trial which could be considered as supporting these allegations concerned his placement in the restrictive absence program in October 1979 and the referrals to physicians in December 1979, both well beyond the statutory period.

nosed Plaintiff as having hemorrhoids, only the validity and accuracy of that diagnosis.

**B.  Plaintiff's Claims Against Schlitz.**

1.  The evidentiary flow of a disparate treatment case is by now well established.  The initial burden is upon the Plaintiff to establish a prima facie case of racial discrimination.  That being accomplished, the employer is obligated to come forward with a legitimate, non-discriminatory reason for its action.  At this point, the Plaintiff is given a final opportunity to make out his case by establishing that the stated reason is pretextual.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973).  This tripartite order and allocation of proof and production applies in cases brought under 42 U.S.C. § 1981 as well as those under Title VII.  *Long v. Ford Motor Co.*, 496 F.2d 500, 505 n. 11 (6th Cir.1974); *Epps v. Continental Can Co.*, 24 Fair Empl. Prac.Cas. (BNA) 26, 29 (M.D.N.C.1980).  Despite the shifting of these intermediate burdens of production, the ultimate burden of persuasion remains on the Plaintiff throughout the proceedings.  *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. at 1093.

2.  In order to establish a prima facie case, Plaintiff need merely offer evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.  *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977).  As pointed out by Justice Powell in *Burdine*, this is certainly not an onerous burden.  450 U.S. at 253, 101 S.Ct. at 1093.

3.  This court finds that Plaintiff has met this threshold burden.  Plaintiff's supervisor referred to both him and other black employees in a disparaging manner.  It was Plaintiff's supervisor who questioned Plaintiff's medical excuses, prompting Industrial Relations to investigate them.  Connell also harassed the Plaintiff about his leg brace, which led directly to one suspension.

4.  Employers are clearly liable for the acts of those they place in supervisory capacities.  *See, e.g., Miller v. Bank of America*, 600 F.2d 211, 213 (9th Cir. 1979); *Tomkins v. Public Serv. Elec. & Gas Co.*, 568 F.2d 1044, 1048–49 (3d Cir. 1977); *Barnes v. Costle*, 561 F.2d 983, 993 & n. 71 (D.C.Cir.1977).  *See Garber v. Saxon Business Products*, 552 F.2d 1032, 1032 (4th Cir.1977).  Connell's actions may therefore be imputed to Schlitz in order to establish the prima facie case.

5.  Derogatory comments and ethnic slurs standing alone may be actionable under Title VII.  *Cariddi v. Kansas City Chiefs Football Club*, 568 F.2d 87, 88 (8th Cir.1977); *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).  Thus such statements can aid Plaintiff in establishing his prima facie case for wrongful termination.

6.  Whether such statements establish animus on the part of Schlitz is of course a question of degree.  "Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions."  *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir.1981) (quoting *EEOC v. Murphy Motor Freight Lines, Inc.*, 488 F.Supp. 381, 384 [D.Minn.1980].).  On the other hand, racially abusive language which is "repeated," "continuous," or "prolonged" violates Title VII.  *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir.1982).

7.  This court has concluded that Connell's racial statements were infrequent at best.  Nevertheless, these statements do tinge Connell's actions with a racially discriminatory air, particularly his actions in questioning Plaintiff's medical excuses.  The events surrounding the questioned medical excuses of August and December are significant, since they were the precipitating factors in Plaintiff's discharge.  The court thus concludes that Plaintiff has

made out a prima facie case of racial discrimination, sufficient to require Defendant Schlitz to put forth a legitimate, non-discriminatory reason for its action.

8. This court also concludes that Schlitz has carried its burden in this regard. An employer's discharge based on attendance, if properly established, is sufficient to rebut an inference of discrimination and shift the burden of production to the Plaintiff in a disparate treatment case. See, *e.g., EEOC v. Federal Reserve Bank*, 698 F.2d 633, 665–69 (4th Cir.1983); *Wright v. Southwest Bank*, 648 F.2d 266, 267 (5th Cir.1981); *Leftwich v. United States Steel Corp.*, 470 F.Supp. 758, 766 (W.D.Pa.1979). Plaintiff's attendance record was, even before the events of December 1979, sufficient to justify Plaintiff's discharge. None of the demerits on Plaintiff's record prior to December 1979 can be seriously questioned. Although Plaintiff claims that he was improperly awarded eight demerits for what should have been an excused absence at the VA hospital in August 1979, the evidence is uncontradicted that that excuse did not meet the five criteria of Schlitz for a valid medical excuse. The date Plaintiff was permitted to return to work was missing, and the date of the statement was incorrect. Moreover, the excuse gave no indication that Plaintiff could not work, but contained only the cryptic reference that Plaintiff was being "followed." By his own testimony, Plaintiff was being treated on an out-patient basis at the VA hospital in Durham at this time. He was being "followed" during the day, but was staying at the Holiday Inn in Durham at night. Since Plaintiff was working the night shift at this time, and conceivably could have been treated briefly during the day and still worked at night, the court does not find Schlitz's reluctance to accept this excuse to be discriminatory.

9. Plaintiff was requested to substantiate this excuse. Again by his own testimony, Plaintiff had difficulty locating the doctor who had treated him in August. Plaintiff eventually called Dr. Ward's parents, who informed Plaintiff that Ward had been relocated to Fort Bragg, North Carolina. Ultimately, Plaintiff did receive another excuse from Dr. Ward. This excuse was, however, even more unsatisfying than the first. The latter excuse stated only that "Mr. Johnson was seen by me on 8/6/79 in VA clinic." The days Plaintiff had missed, however, were the second, third, and fourth of that month. It is inconceivable that Plaintiff would exert all this effort in tracking down Dr. Ward, and then present an even more deficient excuse to his employer than the first. The August demerits were properly awarded.

10. The August demerits and a subsequent demerit for tardiness resulted in the company placing Plaintiff in a "restricted absence program." This in itself was not discriminatory, since management testified that other employees, some of them white, had been placed in such programs. While the terms of this program were that no excuse was to be accepted, the Company's actions refute this, for two reasons. First, Plaintiff's supervisor, aware of the restricted program Plaintiff was in, allowed Plaintiff to leave work on December 2, telling him to bring back a medical excuse. Second, Thompson's actions in investigating the validity of the excuse refute the notion that no excuse would have been accepted. The court concludes that a valid medical excuse would not have resulted in Plaintiff's discharge under the restricted program.

11. On its face, the December excuse was valid under the Schlitz medical excuse rule. However, considering Plaintiff's poor attendance record and his never before having been excused for hemorrhoids, Industrial Relations understandably questioned Plaintiff's excuse. Their initial inquiry actually supported the excuse. Dr. Hairston told Thompson that he had treated Plaintiff for hemorrhoids and that they were serious enough to keep Plaintiff out of work for two days.

12. A more trusting employer would perhaps have ended its inquiry here. Schlitz did not. The court cannot question the appropriateness of Schlitz's conduct,

only whether it was discriminatory. Even-handed unfairness or poor business decisions, standing alone, are not actionable under § 1981 and Title VII. *See, e.g., Tims v. Board of Education,* 452 F.2d 551, 552 (8th Cir.1971); *Epps v. Continental Can Co.,* 24 Fair Empl.Prac.Cas. (BNA) 26, 30 (M.D.N.C.1980); *Turner v. Drug Fair Community Drug Co.,* 5 Fair Empl.Prac. Cas. (BNA) 1190, 1191 (E.D.Va.1972), *aff'd,* 5 Fair Empl.Prac.Cas. (BNA) 1191 (4th Cir. 1973). Schlitz arranged for Plaintiff to be examined by the company physician, Dr. Duncan Cater, who found no evidence of hemorrhoids. This was notwithstanding that Plaintiff claims he was still suffering from bleeding and itching at this time. Plaintiff then refused to be examined by a third doctor, and was terminated. Ray Connell played no role in the termination decision.

13. This court's ultimate conclusion is that Plaintiff has not made out his claim of disparate treatment. No evidence was presented that any white employee with an attendance record similar to Plaintiff's was not discharged. It is interesting to note that in his deposition, introduced by Plaintiff as an exhibit at trial, Plaintiff named three people who had missed more work time than he but had not been discharged. Deposition of Michael Johnson at 64–65. No evidence was presented at trial to substantiate this claim, however. This is a glaring deficiency in light of the extensive discovery which Plaintiff's attorneys conducted.

14. The only evidence which Plaintiff offered to establish pretext was eight medical excuses which had been accepted from white employees despite deficiencies. Neither party questions that the December excuse was technically sufficient. If Plaintiff's intent is to establish that the non-acceptance of the deficient excuse in August was therefore discriminatory, the court cannot accept that conclusion. Plaintiff's presentation of eight excuses out of over one hundred and fifty personnel files subpoenaed is insufficient to establish pretext. It becomes even less probative in light of Schlitz's employment of over 470 individu-als. *See Miller v. Mercy Hosp., Inc.,* 720 F.2d 356, 368 (4th Cir.1983) (three hiring episodes over four years "was a treacherously small sample from which to deduce a general mind-set of racial prejudice.")

15. Nor was Schlitz's termination of Plaintiff without "good cause" or otherwise contrary to the collective bargaining agreement as alleged in the complaint. Plaintiff's discharge was based upon his attendance record. An employer has the right to terminate an employee for poor attendance, and this is clearly "good cause."

16. Having found that the Plaintiff's evidence was insufficient to establish the breach by the Union of its duty of fair representation during the arbitration hearing, and that termination for poor attendance is "good cause" as that phrase is commonly used in collective bargaining contracts, Plaintiff's claim against the company under 29 U.S.C. § 185 for violation of the collective bargaining contract must fail. While the collective bargaining agreement was not introduced into evidence, Plaintiff alleged in his complaint that the agreement provided that "no employee shall be disciplined or discharged without just cause," and that the agreement established a grievance procedure "culminating in binding arbitration." Plaintiff also testified at trial concerning the adverse decision by the arbitrator. Under these circumstances, to prevail against the company the Plaintiff must show not only that his discharge was contrary to the contract but must also carry the burden of demonstrating the breach of duty by the Union. This he failed to do. *See Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059–60, 47 L.Ed.2d 231 (1976).

The court will enter a judgment simultaneously herewith disposing of this action in accordance with this memorandum opinion.