MINORITY POLICE OFFICERS ASS'N OF SOUTH BEND; James Earl Clark, Jr.; John Williams; Shirley Woods; Lynn Coleman; Norval Williams; Hiram Bonds; Austin Davis; and Curtis Walton, Plaintiffs,

v.

CITY OF SOUTH BEND, INDIANA, a municipal corporation; Roger O. Parent, individually and as the Mayor, City of South Bend, Indiana; Board of Public Safety, South Bend, Indiana; Charles W. Roemer, individually and as the President of the Board of Public Safety, City of South Bend, Indiana; Elmer Carr, individually and as a member of the Board of Public Safety, South Bend, Indiana; Stanley Przybylski, individually and as a member of the Board of Public Safety, City of South Bend, Indiana; and Dan D. Thompson, individually and as Chief of Police, City of South Bend, Indiana Police Department, Defendants.

James Earl CLARK, Jr. and Lynn Coleman, Plaintiffs,

v.

CITY OF SOUTH BEND, INDIANA, a municipal corporation; Roger O. Parent, individually and as Mayor, City of South Bend, Indiana; Board of Public Safety, South Bend, Indiana; Elmer Carr, individually and as a member of the Board of Public Safety, City of South Bend, Indiana; Stanley Przybylski, individually and as a member of the Board of Public Safety, City of South Bend, Indiana; Gene Norris, individually and as a member of the Board of Public Safety, City of South Bend, Indiana; and Dan D. Thompson, individually and as Chief of Police, City of South Bend, Indiana Police Department, Defendants.

Nos. S 81–402, S 83–523.

United States District Court, N.D. Indiana, South Bend Division.

Sept. 5, 1985.

Charles F. Crutchfield and Patrick Brennan, South Bend, Ind., for plaintiffs.

Richard L. Hill, Robert C. Rosenfeld and Eugenia Schwartz, South Bend, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

The plaintiffs in this case alleged that the defendants discriminated against them in their employment on the basis of race in violation of the Ninth Amendment and the Fourteenth Amendment to the Constitution of the United States, 42 U.S.C. §§ 1981 and 1983 [1]. Two of the named plaintiffs, James Earl Clark, Jr., and Lynn Coleman, have also alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The plaintiffs' claims alleged discrimination in recruitment, hiring, promotion, training, and other conditions of employment. By order of this court dated January 31, 1983, plaintiffs' claims based on hiring and recruitment were dismissed

---

1. In light of cases decided by the Supreme Court of the United States in recent years, it is not clear whether Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. provides an exclusive remedy for state and local employees alleging claims of discrimination in employment or whether an employee can also bring those claims under 42 U.S.C. §§ 1981 and/or 1983. Although there is a conflict between circuits on this issue, the Seventh Circuit Court of Appeals has held that a plaintiff can bring a claim under 42 U.S.C. § 1983 even if the same facts could state a claim under Title VII against state and local employers. Trigg v. Fort Wayne Community Schools, 766 F.2d 299 (7th Cir. 1985); Cf. Tafoya v. Adams, 612 F.Supp. 1097 (D.Colo.1985) (Title VII exclusive remedy); see also Jenkins v. Blue Cross Mut. Hospital Ins., Inc., 538 F.2d 164 (7th Cir.1976) (42 U.S.C. § 1981 and Title VII).

and all of plaintiffs' claims under the Ninth Amendment to Constitution of the United States were dismissed. *Minority Police Officer Association v. City of South Bend,* 555 F.Supp. 921 (N.D.Ind.1983), *aff'd in part,* 721 F.2d 197 (7th Cir.1983).[2]

This case was tried by the court without a jury on June 3, 4, 5 and 6, 1985. At the close of plaintiffs' evidence, all claims of Amando Garcia, John Floyd and Frank Murphy were dismissed [3] and all of plaintiffs' claims under 42 U.S.C. § 1983 were dismissed. At the conclusion of the trial, plaintiffs were given until June 15, 1985 to file any further objections to defendants' exhibits.

Both parties filed briefs on the evidence and law in this case. All counsel were afforded an opportunity for extensive oral argument on July 18, 1985. No counsel engaged in such extensive oral argument but asked this court to rely on their written presentations. This court has done so and such has required an inordinate amount of judicial time to engage in a massive dissection of this record. This memorandum and order contains the findings of fact and conclusions of law thereon pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I. *Preliminary Matters*

#### A. *Statute of Limitations*

■ The plaintiffs continue to maintain that the two year statute of limitations set forth in I.C. 34-1-2-1.5 should not apply because past discriminatory acts may be relevant to show intent as to present discrimination. Defendants raised the statute of limitations defense in their earlier motion for summary judgment and the court

ruled that a two year statute of limitations would apply to plaintiffs' claims under 42 U.S.C. §§ 1981 and 1983. *Minority Police Officers Ass'n of South Bend v. City of South Bend, Indiana,* 555 F.Supp. 921 (N.D.Ind.1983). The court specifically held that any claims for alleged discrimination occurring prior to November 23, 1979 would not be considered. *Id.* at 926. Neither party has provided the court with any authority in support of a different limitations period nor has the court found any such authority. Accordingly, although earlier actions of the defendants are admissible, any such actions may not form a basis for relief in this case.

#### B. *Admissions of Exhibits*

■ At trial, plaintiffs objected to defendants' exhibits G, H, I, J, K, L, M, O, P and R. Those exhibits were admitted conditionally. On June 13, 1985, the plaintiffs filed written objections with respect to those exhibits alleging that those exhibits were inadmissible on three grounds: (1) the charts did not accurately reflect the information taken from the underlying documents because the records of Minority Sworn Personnel for the years 1979 and 1981 were missing from documents supplied to plaintiffs by defendants; (2) inconsistencies in underlying documents regarding ethnic category of Tim Corbett and Richard Badics; and (3) plaintiffs should be permitted to cross-examine the proponent of the exhibits who prepared them to determine what impact, if any, the inconsistencies had on the minority percentages depicted on the charts. In response to plaintiffs' written objections, the defendants, by sworn affidavit of Ronald G. Mareiniak,

---

**2.** The January 31, 1983 opinion of this court also addressed issues of class certification and statute of limitations. On appeal, the Seventh Circuit affirmed the district court's dismissal of the hiring and recruitment claims but dismissed the appeal for lack of jurisdiction on the class certification and statute of limitations issues upon a finding that they were not final orders within the meaning of Rule 54(b) of the Federal Rules of Civil Procedure. *Minority Police Officers Ass'n v. City of South Bend,* 721 F.2d 197 (7th Cir.1983).

**3.** The claims of John Floyd and Frank Murphy were dismissed because they did not testify at trial and the documentary evidence related to their claims did not support a finding of discrimination against them. The claims of Armando Garcia were dismissed because he is of hispanic origin and the evidence did not show that the defendants had discriminated against him on the basis of national origin.

Chief of the Services Division of the South Bend Police Department, indicated that the Minority Sworn Personnel records for 1979 and 1981 have been provided to plaintiffs. In his affidavit, Chief Marciniak stated that the exhibits in question were complete, accurate and authentic and based on the underlying documents. He further stated that in compiling the information contained in exhibits G, H, I and R, Tim Corbett and Richard Badics were included in the non-minority group in every calculation and compilation. Chief Marciniak testified at trial, on cross-examination and direct examination with respect to the documents in question. In further support of their argument that the questioned exhibits should be admitted, the defendants maintain that cross referencing defendants' exhibits F and S, which were admitted without objection, reflects the accuracy of defendants' exhibits H, I, J, K, L, M, O, P and R and that only the information contained in Exhibit G cannot be deduced from other exhibits. A close look at the exhibits, however, reveals that no such comparison can be made. Exhibit H contains information on the racial composition of the total sworn work force on November 1, 1979. Exhibits F and S are the roster of police officers in 1982 and 1985.[4] Although they reflect the hiring dates of the officers listed thereon, it does not reflect who may have been on the force in 1979 but retired or resigned in the intervening years. Accordingly, the accuracy cannot be verified. Exhibit I contains information regarding the racial composition of the work force on November 1, 1981. This information cannot be verified for the same reasons Exhibit I could not be verified. Further, this exhibit indicates there

were 228 sworn officers at the South Bend Police Department on November 1, 1981. Exhibit S is the roster of officers on the South Bend Police Department in 1982 and reflects 225 officers. Exhibit A to the pretrial order in this case, which was stipulated to by the parties as identifying the police officers on the South Bend Police Department as of November 23, 1981 appears to be the same list and reflects that there were 225 sworn officers of which 20 were black.[5] Thus, three officers would have had to have left the South Bend Police Department between November 1, 1981 and November 23, 1981, of which one would have to have been black. Since information contained in Exhibit S does not reflect the information regarding when officers ceased to be on the force, Exhibit I cannot be verified. Exhibits J, K, O and P cannot be verified because there was no evidence presented on what criteria eligibility for promotion was based. Further, because this court was unable to determine who was eligible for promotion in the above described exhibits, this court cannot verify the percentage information contained in Exhibits L and M. Defendants' Exhibit R contains information reflecting the racial composition of the South Bend Police Department as of May 1, 1985 and reflects a total sworn work force of 228 with 32 minorities. Exhibit E reflects 229 officers on the roster with 32 minorities. Accordingly, the statistics contained on Exhibit R are incorrect. Accordingly, the plaintiffs' objections to defendants' exhibits G, H, I, J, K, L, M, O, P and R are sustained. *Cf. Coates v. Johnson & Johnson*, 756 F.2d 524, 549–50 (7th Cir.1985).

---

4. Defendants' Exhibit S admitted into evidence without objection and Exhibit A attached to the Pretrial Order filed in this case on April 8, 1985 are identical in terms of content. The parties stipulated in the Pretrial Order that Exhibit A attached thereto contained the ranks, dates of hiring, assignment and dates of last promotion of the sworn police officers and recruits at the South Bend Police Department as of November 23, 1981. Accordingly, this court has utilized the information contained in Exhibit A attached to the Pretrial Order in determining the racial composition of the workforce as of that date.

5. Although the parties stipulated in the Pretrial Order that there were 232 sworn police officers on the South Bend Police Department as of November 23, 1981, and that 24 of the officers were minorities, the roster of sworn police officers and recruits attached as Exhibit A to the Pretrial Order indicates that there were 225 officers and 20 blacks. As indicated in the preceding footnote, this court has used the information contained in Exhibit A in its decision in this case.

### C. *1984 South Bend Police Department Promotion Plan*

On May 24, 1985, the plaintiffs filed a Motion for Temporary Restraining Order seeking an injunction prohibiting defendants from implementing a document entitled "South Bend Police Department Promotion Plan" (1984 Promotion Plan). At the commencement of the trial, plaintiffs' motion was consolidated with the trial on the merits of this case.

In their motion, plaintiffs alleged that the Board of Public Safety of South Bend, Indiana approved the 1984 Promotion Plan in October 1984 and that the plan was offered as a "good faith" effort to correct the discriminatory policies and practices concerning promotion at the South Bend Police Department. The plaintiffs further alleged that the 1984 Promotion Plan would not correct the existing inequities as to promotion but would make promotion more difficult for the plaintiffs by adding a written examination to the promotion procedure. The only witness who testified with respect to this new promotion plan on behalf of the plaintiffs was Norval Williams and his only testimony regarding the 1984 Promotion Plan was that it included a written examination as part of the procedure.

The 1984 Promotion Plan was developed by a ten (10) member task force consisting of eight sworn officers of the South Bend Police Department of ranks from Corporal to Chief and two (2) members of the Board of Public Safety. The 1984 Promotion Plan was approved by the Board of Public Safety and become effective on the date adopted by the Board. It does not affect any officers previously promoted to permanent rank.[6]

The stated purpose of the 1984 Promotion Plan was to develop and implement a system of promotion based on competence and fairness toward all officers without regard to race, religion, sex, national origin or political affiliation. The 1984 Promotion Plan contains detailed instructions on how the system is to be operated and is neutral on its face with respect to race. In determining who will be promoted under the 1984 Promotion Plan, three basic factors are taken into consideration: seniority, written examination scores and performance evaluation scores. The plaintiffs maintained in their motion that the written examination adds to the already existing discriminatory practices and policies and that "any objectivity or fairness" in the system is "highly unlikely and almost impossible in the existing 'polluted work environment' with a rating system that is dominated and controlled by all white supervisors." First, the fact that a written examination is included as part of the promotion procedure does not in itself establish racial discrimination. *See, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The plaintiffs have presented no evidence that the written examination has a disparate impact on the plaintiffs or that it is not related to job performance. Nor have plaintiffs alleged or shown that it has or will be administered in a discriminatory manner. Further, the plaintiffs have not presented any evidence that the performance evaluation portion of the 1984 Promotion Plan is discriminatory on its face or will be operated in a discriminatory manner. The factors listed on the performance evaluation form are related to job performance. The plaintiffs' assertion that the system is dominated and controlled by all white supervisors has no support in this record and as indicated in a later portion of this memorandum, the plaintiffs have not shown that the work environment at the South Bend Police Department is so polluted as to constitute a violation of Title VII. Furthermore, the plaintiffs have failed to show how some alleged racial remarks or incidents that

---

**6.** Defendants' Exhibit E contains the May 1, 1985 roster of sworn police officers on the South Bend Police Department. Some of the ranks of those officers listed were indicated as "Acting" ranks. The Board of Public Safety would not approve any permanent promotions of any police officers until a promotion plan for the South Bend Police Department had been adopted and approved. The officers with "Acting" ranks had the same responsibilities and received the same pay as those of similar permanent rank.

have occurred in the past will have any bearing on future performance evaluations.

Accordingly, the plaintiffs have failed to show that they are entitled to an injunction against defendants prohibiting them from implementing the 1984 Promotion Plan.

## II. *Findings of Facts*

### A. *Individual Plaintiffs and Minority Police Officers Association of South Bend, Indiana*

Plaintiff, Minority Police Officers Association of South Bend, Indiana (Association) is a non-profit, unincorporated association of minority police officers of the South Bend Police Department. Only three of the named plaintiffs, Norval Williams, James Earl Clark, Jr., and Lynn Coleman testified that they were members of the Association.[7] The basic purposes of the Association were to achieve equal opportunity for all people with respect to employment in all police departments, actively support recruitment of personnel for police work to ensure proportionate representation, encourage racial and ethnic harmony, expand knowledge of various cultures and heritages of other people and educate other members of the police profession on own culture, constantly remind members of Association of oath and obligation as police officers and to strive to improve conditions in the police department, profession and community. On November 9, 1981, the Association sent a letter to Mayor Roger Parent and Charles Roemer as President of the Board of Public Safety outlining the Association's concerns regarding the promotions at the South Bend Police Department. There were two meetings in which minority police officers of the Association met with Mayor Parent to discuss promotions at the South Bend Police Department. All of the named individual plaintiffs are black, sworn police officers of the South Bend Police Department.

### City of South Bend, Indiana

The City of South Bend, Indiana is an Indiana municipal corporation. It is a second class city with a population of 109,727 according to the 1980 Census and has a mayor-council form of government. Roger O. Parent is the duly elected mayor of South Bend and was the mayor at the time of the November 1981 promotions at the South Bend Police Department. Mayor Parent's duties include executing and supervising enforcement of the laws of the State of Indiana and ordinances of the City of South Bend; appointing heads and employees of various departments of the city government including the appointment of the Chief of Police of the South Bend Police Department and the members of the Board of Public Safety of the City of South Bend (Board of Public Safety).

### Board of Public Safety of City of South Bend

Current members of the Board of Public Safety are Elmer Carr, Stanley Przybylinski and Gene Norris. At the time of the 1981 promotions, Charles Roemer, Elmer Carr and Stanley Przybylinski were the members of the Board of Public Safety. Elmer Carr, a black, is the current President of the Board. Charles Roemer, Stanley Przybylinski and Gene Norris are white. The powers of the Board of Public Safety include the power to employ, promote and discharge sworn members of the South Bend Police Department pursuant to I.C. § 36–8–3–1 *et seq.*

### Chief of Police

Charles Hurley is the present Chief of Police of the South Bend Police Department and was appointed by Mayor Roger Parent on April 2, 1984. Daniel Thompson was the Chief of Police prior to Chief Hurley having been appointed on August 11, 1980 to fill the vacancy of Chief upon Michael Borkowski's resignation. Michael Borkowski was Chief of Police from Janu-

---

7. The affidavit of James Earl Clark, Jr., plaintiffs' Exhibit 10, indicated that all minority police officers at the South Bend Police Department were either members or supporters of the Association. There has been no evidence introduced that shows the membership of the Association.

ary 1, 1976 until his resignation in August of 1980.

*South Bend Police Department*

The South Bend Police Department had 225 sworn police officers on November 23, 1981, of which 20 were black. Of those 20 black officers, four had no rank, nine were corporals, five were sergeants, one was lieutenant and one was a division chief. Two of the black sergeants were promoted from corporal to sergeant in the November 1981 promotions.

On May 1, 1985, there were 229 sworn officers on the South Bend Police Department, of which 30 were black. Of those 30 black officers, nine were patrolmen, sixteen were corporals, two were sergeants, two were acting lieutenants and one was an acting captain.

At all times relevant to this case, the South Bend Police Department Duty Manual contained the following provision:

308.00 PLEDGE AGAINST DISCRIMINATION AND COERCION

"It is the policy of the City of South Bend, Indiana to provide equal opportunity in employment without regard to race, religion, color, national origin, physical handicap, age, or sex. Employment actions and activities include, but are not limited to hiring, discharging, classifying, transferring promotion or upgrading, determining pay raises, eligibility for participation in the staff benefit program, training and re-training, assigning work tasks, tools, equipment and space. The City continuously promotes this policy through a program of positive action affecting all organizational units which are managed by, or affiliated with the City of South Bend, Indiana. Through this program the City carries out the requirements of federal executive orders, Numbers 11246 and 11375 of the Civil Rights Act of 1964, and the Equal Employment Act of 1972, and all other applicable laws, and indicates its active support of other principle of equal opportunity in employment." (City of South Bend Equal Employee Opportunity Policy.)

All officers on the South Bend Police Department are required to know and abide by the provisions contained in the Duty Manual.

**B. *Training***

At the South Bend Police Department, there are two ways in which officers can receive training, in-house training and outside training. In-house training programs are developed for areas where there is a need for additional training in an area that is weak and the South Bend Police Department has people who have knowledge in that area or the department can get someone to come in and offer the needed training. The Chief of Police meets with the Division Chief of Services to determine in what areas in-house training is needed and the training director then develops the in-house training schedule for a year. In-house training is available to all officers on the South Bend Police Department. Notices of in-house training are posted and given to supervisors for dissemination and officers can sign up to take the training. Some officers are required to take certain in-house training.[8]

The Chief of Police has the final say on which police officers attend outside training schools. In deciding which officers should attend outside training, the Chief looks at the officers in the department and if an officer needs additional training in his area of work, that officer will be sent to an appropriate school. Also, some officers may be sent to training if it will benefit the South Bend Police Department or community generally. There is no procedure for applying to attend outside training.[9] When

---

8. In-house training includes field training program in which officers in Patrol are trained in how to function on the street. Curtis Walton was a training officer in that program.

9. The record reflects that Armando Garcia requested to attend some outside training schools in 1975 and 1976. Plaintiffs' Exhibits 34, 35 and 36. There is no evidence of what procedure was used in those years with respect to attend-

officers return from outside training, the knowledge they obtained will be shared with others they work with and may be put into written form for dissemination. Outside training schools are more advanced that in-house training and generally an officer is selected to attend that is already working in the area to which the particular outside training is directed. The normal practice is for the Chief of Police to submit the names of the officers to attend outside training to the Board of Public Safety who approves the recommendations. The Chief's reports are now submitted quarterly for approval.

The plaintiffs submitted minutes of twenty-three (23) Board of Public Safety meetings which contained information concerning attendance at outside training by officers of the South Bend Police Department from December 1979 through March 1982. According to those minutes, sixty-nine (69) identified officers attended outside training during that period of time, which included six patrolmen, twenty-one corporals, nineteen sergeants, fifteen lieutenants, six captains, six chiefs and two officers of unknown rank.[10] Of the sixty-nine officers who attended outside training, there were three black which included Fred Preston, Cullen Walton and Eugene Kyle. The subject matter of the outside training included homicide investigation, police department administration, photography, chemical test recertification, bombs, identifying stolen coin collections, search and seizure update, accident investigation, fire/arson investigation, drug enforcement, interrogation, vehicle theft, emergency care, fingerprinting, antiterrorism, child abuse and stress.

The minutes do not reflect the race of the officers attending outside training and Charles Roemer testified that he did not know or recognize all of the officers that had been recommended for training so he could not say whether they were black or white, but that the majority that he did recognize were white. No officers ever directly sought permission from the Board of Public Safety to attend a certain school. The Board of Public Safety was concerned that a sufficient number of blacks attended outside training and had several conversations with Chief Dan Thompson about that subject. Mr. Roemer did not feel any of the recommendations were discriminatory on their face.

Coleman was the only plaintiff that testified that he had attended some in-house training programs but was not sure of the time frame. Plaintiffs, Shirley Woods and James Earl Clark, Jr., testified that they had each attended one outside training program and plaintiff Clark also testified that he knew that Lieutenant Norval Williams had attended outside training although no time frame was established. Austin Davis, Hiram Bonds and Lynn Coleman all testified that they had not attended any outside training schools.

The race of an individual is not a factor that is considered in determining who attends outside training programs. Nor is outside training considered in rating individuals on their performance evaluations-it is not mentioned on the performance evaluation form nor in the instructions related thereto. Both in-house training and outside training may improve an officer's performance, which performance is considered in promotion, but the training itself is not a factor.

All of the patrolmen who attended outside training have been promoted to corporal which is an automatic promotion in the South Bend Police Department. Of the corporals attending outside training, nine were promoted and eleven were not promoted. Of the sergeants attending outside training schools, eight were promoted and

---

ing outside training nor are the denial of those requests relevant to the issues in this case.

**10.** The Board of Public Safety minutes reflect that one officer attended three outside training schools and four officers attended two outside training schools. Further, an entire unit of offi-

cers (25 or 30) attended an outside training school under the "Managing Criminal Investigation Program." Neither the identity of the individual officers nor their race were identified. Plaintiffs' Exhibit 51.

nine were not promoted. Of the lieutenants attending, four were promoted and eight were not promoted.

### C. *Assignment*

The Chief of Police of the South Bend Police Department is responsible for the assignment and transfers of officers within the department. In determining where an officer should be placed, the abilities of the individual are considered. Officers can and do request certain assignments. Openings for positions within the department are posted and officers may apply for that position by filing an officer's report. Officers may also request a change in shifts. Individual officers within the department have contrasting views on what are prime assignments.

On November 23, 1981 and in 1982, there were twenty black officers on the South Bend Police Department. Thirteen of those officers were assigned to the patrol division, five to the services division, one to the traffic division and one to the detective bureau. In May 1985, there were thirty black police officers on the South Bend Police Department. Twenty-six of those officers were assigned to the patrol division, one to the services division, two to the detective bureau division and one to the traffic division.

At one time or another, there were areas, shifts or subdivisions in the South Bend Police Department in which no blacks have been assigned but there are no divisions where there were no blacks within the relevant time frame. Those areas or subdivisions include records, photography lab, narcotics, vice, SWAT team, intelligence, homicide, fingerprinting and motor transportation. The evidence does not indicate what division or divisions encompass these areas or subdivisions. However, blacks have been assigned to some of those areas.[11]

Blacks have been requested to apply for certain areas or subdivisions including SOS (special operations), undercover and detective bureau but they have not done so. Black officers did not want to be assigned to vice, narcotics or the SWAT team because those divisions dealt with crimes in which minorities were involved. Black officers were also requested to apply for positions in the Community Oriented Police Program and only Curtis Walton was trained to be a training officer in that program.

In April 1985, Lynn Coleman and James Earl Clark, Jr. applied for an opening in the homicide unit that had been posted. There were twenty-three applicants for the opening and Corporal Charles Eakins was selected to fill the position. This decision was made by Chief of Police Charles Hurley, Division Chiefs Donald A. Ruskowski, Thomas Gargis, Ronald Marciniak and Captain Charles Manank. There is no evidence regarding the qualifications for the position nor the qualifications of the various applicants.

Plaintiff Clark testified that he had applied for special assignments but had not been selected. He did not identify the time frame, the position or the identity of the officer selected for the position. None of the other plaintiffs testified that they had applied for a certain position and were not chosen.[12]

The particular assignment of an officer is not a factor in promotion. There may not be an opening in some particular detail for promotion at any given time and if there is no opening, there is no promotion. However, an officer may apply for an opening in any division or detail.

### D. *Promotion*

#### 1. *In-house Promotion Plan*

The plaintiffs' claims of discrimination in promotion focus primarily on a promotion

---

11. Plaintiff Norval Williams has been assigned to the vice squad narcotics section and the detective bureau (robbery, burglary, assault and homicide). Plaintiffs' Exhibit 83. Plaintiff John Williams also testified that he had had a special assignment but did not identify what that assignment was.

12. The record reflects that Corporal Clark was transferred from the traffic to services division and that Acting Lieutenant Norval Williams was transferred from the patrol to detective bureau division.

plan called the "in-house" promotion plan and the promotions made pursuant thereto in November 1981. The in-house promotion plan used in the November 1981[13] promotions at the South Bend Police Department was developed by Chief of Police Daniel Thompson and Division Chiefs Charles Hurley, Spanward Mitchum and Michael Borkowski in response to a ruling by Judge John W. Montgomery, St. Joseph Circuit Court in July 1981 that the Merit Board and Promotion System adopted by the Board of Public Safety was null and void. In developing the plan, a major concern was the elimination of politics in promotion because of its disruption in law enforcement administration and the in-house plan was to allow officers an equal opportunity for promotion and to insure fairness to all involved.

The in-house plan used the performance evaluation and oral interview segments of the Merit Board and Promotion System plan but omitted the written examination. The performance evaluation form itself, which was developed during 1980 and early 1981 as part of the Merit Board and Promotion System,[14] was changed in two respects: (1) the "Physical Fitness and Appearance" was changed to "Appearance" since physical fitness could not be measured, and (2) the signature line of the ratee was omitted. Detailed instructions concerning the use of the performance evaluations and criteria to be used in determining the appropriate rating for individual police officers under each of the eight factors were distributed to all officers participating in the rating process.[15] Those instructions clearly indicated that the rating officer only consider the ratee's performance during the period being reviewed, i.e. the preceding six months, and that each factor was to be considered separately and independently. Further, a rating of "3" was to be considered average and any deviation up or down required a written explanation. The instructions did not include any instruction that race was not an appropriate consideration. The rating and endorsing officers followed the instructions and considered the criteria outlined under each factor in rating the individual officers. All the rating officers and endorsers knew that race was not an appropriate factor and did not consider it.

The eight general factors that all police officers were rated on were quality of work, judgment and common sense, initiative, knowledge of duties, safety consciousness and equipment care, appearance, attitude, and dependability. All of these factors were related to the job performance of a South Bend police officer. In addition to these factors, superior officers (sergeant and above) were rated on three supervisory factors: organization and planning, employee relations and communication skills. The rater also had to check whether the ratee was progressing satisfactorily, qualified for promotion or not qualified for promotion. After the raters had completed their evaluations, the evaluations were reviewed by a superior officer who endorsed the evaluation. The endorser could raise or lower the score by one point on each rating factor and any such changes were to be accompanied by a written explanation. The endorsing officer then multiplied the rated factor by the weight given that factor and those scores were totaled to arrive at the ratee's performance evalua-

---

**13.** The "in-house" promotion plan was apparently also used in the October 1981 promotions.

**14.** The Merit Board and Promotion System plan was developed by a committee of police officers led by Robert Potvin, Assistant to the Board of Public Safety. At least two black police officers were included in that committee: Norval Williams and Cullen Walton. Cullen Walton served as Chairman. Chief Daniel Thompson met with the committee periodically and did not recall any black officer indicating a problem with the performance evaluation form being racially biased.

**15.** All of the police officers were rated by the officer supervising them in the next two higher ranks. Three of the raters were black: Division Chief Spanward Mitchum, Acting Lieutenant (then Sergeant) Norval Williams and Acting Captain (then Lieutenant) Eugene Kyle.

tion score.[16] Every officer was assigned an identification number and the scores of each identification number were averaged. The officers were then grouped by rank and with the personnel in their work detail and ranked in descending order. Approximately the top 10% of officers from each detail, based on the performance evaluation score were entitled to participate in the next stage of the promotion procedure, the oral interview.[17]

The oral interview panels were comprised of four officers of equal or higher rank than the position being interviewed for, two from the division being promoted to, one from the services division and one from the other division.[18] All officers on the eligibility list i.e. oral interview list, could apply for any or all openings in any division.[19] Once the officer became eligible for an oral interview, the performance evaluation score was not considered, it only served as a means of screening for the oral interview stage. The panel agreed in advance on the questions they would ask and each panel member asked one question of each candidate interviewed for promotion. The panel asked the same questions of each candidate. The questions were designed to elicit the supervisory abilities in the area of leadership, problem solving and decision making for uniform sergeants and the candidates investigative abilities for detective sergeant. After the oral interview, the oral interview panel selected the three top candidates for each position based on their interview scores and submitted those names to the Chief of Police. The Chief then submitted the names of those recommended for promotion to the Board of Public Safety which made the promotions in 1981.

### 2. *Norval Williams*

In November 1981, the only plaintiff in this case that was eligible for promotion from sergeant to lieutenant was Norval Williams. Norval Williams became a sworn police officer with the South Bend Police Department on November 1, 1970 and had been promoted to sergeant on January 1, 1976 and was serving in the patrol division in 1981. He was promoted to Acting Lieutenant in the Detective Bureau on April 2, 1984 by Chief Charles Hurley. That position was not open in the fall of 1981. Norval Williams has served in the Uniform Division, Vice Squad (narcotics section), Detective Bureau (robbery, burglary, assault and homicide), and was a desk sergeant. While a desk sergeant, he performed the duties ordinarily performed by a lieutenant because the midnight lieutenant was off work for eighty days due to an injury.

In the fall of 1981, then Sergeant Williams was rated by Captain Larry E. Bennett (white) and Lieutenant Eugene Kyle (black). Captain Bennett went through each item in rating Sergeant Williams and his total score on the performance evaluation was 610. Lieutenant Kyle's rating of Sergeant was 655, which evaluation was endorsed by Captain Bennett.[20] Both Captain Bennett and Lieutenant Kyle indicated

---

16. Each officer was to be made aware of his scores and counseled on his weak and strong areas. One copy of the performance evaluation was given to each officer and one copy was put in the officer's personnel file at the South Bend Police Department. In many cases, the rater reviewed the performance evaluation with the ratee. There was no appeal process contained in the in-house promotion plan, but the police handbook contained a grievance procedure.

17. Only the performance evaluations done in August 1981 were considered in making promotions in November 1981.

18. Acting Lieutenant (then Sergeant) Norval Williams was on one of the oral interview panels.

19. Sergeants requesting lateral transfers to another division were required to go through oral interviews with the corporals seeking promotion to Sergeant in that division.

20. A comparison of the performance evaluation scores of the 5 sergeants rated by Captain Bennett and Lieutenant Kyle in August/September 1981 reveal that Lieutenant Kyle's scores on 4 of the 5 sergeants rated were higher than Captain Bennett's scores and those scores placed the same individual in the number 1 slot and the same individual in the number 5 slot which was Norval Williams.

that Sergeant Williams was qualified for promotion. Captain Bennett commented that Sergeant Williams did an outstanding job in dealing with people on the street. Lieutenant Kyle made no comments. Sergeant Williams' scores on the performance evaluation resulted in him being ranked fifth of five sergeants by both Lieutenant Kyle and Captain Bennett. Both Sergeant Williams and Lieutenant Kyle testified that Lieutenant Kyle rated Sergeant Williams fairly. Lieutenant Kyle's rating alone would have kept Sergeant Williams from qualifying for an oral interview. Because Norval Williams' ranking did not place him in the top 10% of the sergeants in his detail, Sergeant Williams was not eligible for an oral interview or further consideration for promotion. Then Chief Daniel Thompson did not have any input into the decision not to promote Norval Williams in November 1981 since Sergeant Williams did not even reach the interview stage.

### 3. *Shirley Woods*

Shirley Woods became a sworn police officer with the South Bend Police Department on November 1, 1970. She was promoted to corporal on January 1, 1976 and still holds that rank. She is assigned to the Traffic Division and was so assigned in 1981. Corporal Woods was rated in August 1981 by then Captain Thomas Gargis and Sergeant William Hayes. Sergeant Hayes went through each criteria listed in the instructions for each factor on the performance evaluation in rating Corporal

Woods and the resulting score was 640.[21] Captain Gargis' performance evaluation reveals a score of 600. Captain Gargis was the endorser for Sergeant Hayes and both rating officers indicated she was progressing satisfactorily.[22] Corporal Woods testified that she believed she was discriminated against because all whites discriminate against blacks some time in their lives and whites will never rate blacks fairly.

### 4. *Hiram Bonds*

Hiram Bonds became a police officer with the South Bend Police Department on October 16, 1967 and was promoted to corporal in the Patrol Division on April 16, 1973. He still holds the rank of corporal in the Patrol Division and is the only black officer on his shift. Corporal Bonds was rated in the fall of 1981 by Sergean Anthony Gish and Lieutenant Kenneth Delinski. He received a score of 650 from Sergeant Gish and 580 from Lieutenant Delinski. Both raters indicated that he was qualified for promotion. Sergeant Gish's performance evaluation score of Corporal Bonds placed him 3rd of 8 and Lieutenant Delinski's score on Corporal Bonds ranked him 24th of 32 corporals he rated. Corporal Bonds was not eligible for an oral interview or further consideration for promotion since he did not rank in the top 10% of his detail. Hiram Bonds testified that he believed that Sergeant Gish and Lieutenant Delinski were prejudiced against him because they were white and whites can't rate blacks fairly.[23]

---

**21.** Sergeant Hayes also rated Corporal Donald Kuzmits and Corporal Paul Niezgodzki in August 1981 and both were promoted in November 1981. Sergeant Hayes testified that all of the officers in that detail were good but that Corporals Kuzmits and Niezgodzki did a better job than Corporal Woods and were therefore rated higher. Corporal Woods was not in the top 10% of her detail and was therefore not eligible for an oral interview.

**22.** The ranking of Shirley Woods cannot be determined from the evidence in this record. Exhibit 69 shows Sergeant Hayes was rated number 020 and Exhibit 70 shows that he rated officers 008 through 015. According to Exhibit 71, officers with identification numbers 008 through 015 were all white corporals. Exhibit 100, which was the performance evaluation of

Corporal Woods by Sergeant Hayes indicates a score of 640, which correlates to officer number 008 which is identified as a white corporal. Further, Exhibit 69 indicates that Captain Gargis was rated number 500 and Exhibit 70 shows that he rated officers numbered 001 through 021. Exhibit 71 shows that the only black corporal with a number in that group was number 006 and Exhibit 70 shows the score for 006 to be 620. Exhibit 101, which is the performance evaluation of Corporal Woods by Captain Gargis reveals a score of 600. Exhibit 70 shows that officer 008 had a score of 600 but 008 is listed as a white corporal on Exhibit 70.

**23.** Lieutenant Delinski performed all his evaluations of his officers by following the instructions and criteria outlined in Defendants' Exhib-

#### 5. *Austin Davis*

Austin Davis joined the South Bend Police Department on December 16, 1971 and was promoted to Corporal on January 1, 1977. He still holds the rank of corporal and is assigned to the Patrol Division. In August 1981, Corporal Davis was rated by Sergeant Julius Halasz, Sergeant Arthur Deak and Lieutenant Patrick Cottrell and all three evaluations were endorsed by Captain Donald Ruskowski. Lieutenant Cottrell and Sergeant Halasz marked the "not qualified" line on the performance evaluations of Corporal Davis. Sergeant Deak marked the "progressing satisfactorily" line but in endorsing Sergeant Deak's rating of Corporal Davis, Captain Ruszkowski marked that out and marked the "not qualified" line, adding "not progressing satisfactorily and definitely not qualified." Corporal Davis received scores of 480 from Lieutenant Cottrell, 455 from Sergeant Halasz and 540 from Sergeant Deak. All three rating officers noted problems with his dependability and appearance.[24] Sergeant Halasz's score ranked him 4th of 5 corporals, Lieutenant Cottrell ranked him 16th of 19 corporals and Sergeant Deak's score ranked him 10th of 11 corporals. Because he was not in the top 10% of the corporals in his detail, he was not eligible for further consideration for promotion.[25]

#### 6. *John Williams*

John Williams became an officer with the South Bend Police Department on March 13, 1973 and was promoted to Corporal on January 1, 1977, the rank he still holds and is in the Patrol Division. In August 1981, Corporal Williams was rated by Lieutenant Eugene Kyle, Sergeant Thomas Fautz and Sergeant Sam Young. All three raters indicated he was qualified for promotion. Lieutenant Kyle, a black, gave him a 710 on his performance evaluation and Sergeant Fautz and Sergeant Young, both whites, rank him a 670 and 700 respectively. Sergeant Young noted in his comments that Corporal Williams would definitely make a good sergeant. Captain Bennett was the endorser on all 3 ratings and he did not make any changes on any of the 3 performance evaluations. All of the comments on Corporal Williams' evaluations were positive. Sergeant Young's rating of John Williams placed him 2nd of 14, Lieutenant Kyle's placed him 2nd of 29 corporals he rated and Sergeant Fautz's evaluation placed him 7th of 13 corporals.[26] Corporal Williams combined evaluations did not place him in the top 10% of his detail so he was not on the eligibility list for an oral interview nor for further consideration for promotion.

Corporal Williams complained to the Board of Public Safety about Sergeant

---

it A as a basis, taking each individual and determining for each category whether they were average (a 3) or higher or lower. Lieutenant Delinski gave Corporal Bonds a 4 on 3 factors: quality of work, judgment and common sense, and appearance. He had grown up with Corporal Bonds, had known him since 1947 and considered they were friends.

**24.** Corporal Davis was rated low by all three rating officers on dependability because he was absent between 12 and 15 days and late 5 times during the period being rated, which was indicated in their comments. Corporal Davis was also rated low on appearance and had not heeded instructions to improve his appearance.

Sergeant Halasz and Lieutenant Cotrell rated Corporal Davis low on safety consciousness and equipment care. Captain Ruszkowski also thought Austin Davis was below average in this category because he had loaded a shotgun with the shell facing backward, which could cause the gun to explode. Lieutenant Cottrell rated

Corporal Davis low on safety because Davis' gun was found to be dirty and to have corroded bullets and because he had a low shooting score. Lieutenant Cottrell thinks it important for a police officer to be able to hit the person intended and not a bystander.

Sergeant Halasz used the instructions, Defendants' Exhibit A, in doing his performance evaluations and took the job "very seriously." During the same performance evaluation rating, Sergeant Halasz rated two black patrolmen, Tommy Williams and Sherri Taylor, much higher than Corporal Davis: 600 and 580, respectively. No one Sergeant Halasz rated in August 1981 was promoted, either black or white.

**25.** Corporal Davis raised no specific allegations of racial bias concerning Sergeant Deak, Lieutenant Cottrell or Captain Ruszkowski.

**26.** Both Sergeant Young and Lieutenant Kyle rated Corporal Thomas Trenerry higher than Corporal Williams.

Fautz evaluating him because he had only worked with Sergeant Fautz a few times and that Fautz had only been a sergeant for a short period of time. He also stated he did not think it was fair that a captain could change the ratings given by a superior officer even though this was not done in his case. Corporal Williams' complaint was with the entire system, he thought that Lieutenant Kyle rated him fairly.

### 7. Curtis Walton

Curtis Walton became a police officer with the South Bend Police Department on December 16, 1973 and was promoted to Corporal on January 16, 1977, the rank he still holds today. He was assigned to the Patrol Division. Corporal Walton was rated in August 1981 by Acting Captain (then Lieutenant) Eugene Kyle and Sergeant Eugene Basker. Lieutenant Kyle's performance evaluation reveals a score of 640 and was marked qualified for promotion. Sergeant Basker gave Corporal Walton a 490, which was later changed to a 550 by Captain Larry Bennett in the endorsing process. Sergeant Basker also indicated that Corporal Walton was qualified for promotion. Lieutenant Kyle's rating place him 18th of 29 corporals [27] and Sergeant Basker's rating placed him tied at 12th of 17 rated. Corporal Walton stated that he believed Sergeant Basker rate him low because his parents had raised him to believe that white people always try to keep blacks second class citizens. Corporal Walton testified that he thought Captain Bennett was prejudiced because everyone has prejudice in them.

### 8. James Earl Clark, Jr.

James Earl Clark, Jr. joined the South Bend Police Department on December 16, 1973. He was promoted to corporal on January 1, 1977 and still holds that rank. In 1981, he was in the Patrol Division but is now assigned to the Services Division. In August 1981, Corporal Clark was rated by Assistant Chief (then Captain) Thomas Gragis and Lieutenant (then Sergeant) Larry Blume.[28] Captain Gargis rated him 16th of 20 corporals with a score of 620 and all of his comments were positive. Captain Gargis specifically noted that Corporal Clark's score "could be much higher with some effort." Sergeant Blume rated him 6 of 7 with a score of 610 and indicated that Corporal Clark was qualified for promotion. Corporal Clark's scores on his performance evaluations did not place him in the top 10% of his detail so he was not qualified to proceed to the oral interview stage nor to be considered further for promotion.

Corporal Clark testified that he believed Captain Gargis rated others higher because he liked them and because he had a personality conflict with him. Corporal Clark also testified that Sergeant Blum rated him low because of his, Corporal Clark's, attitude. James Clark was transferred out of the Traffic Division to the Services Division soon after the performance evaluations were done because of an incident in which Corporal Clark stated he had seen performance evaluations of other officers and later admitted that he had not.

### 9. Lynn Coleman

Lynn Coleman joined the South Bend Police Department on April 4, 1978 and was promoted to corporal on April 4, 1981 and still holds that rank. He was assigned to the Patrol Division in 1981 and is still assigned there. In August 1981 Corporal Coleman was rated by Sergeant Eugene Basker, Acting Lieutenant (then Sergeant) Norval Williams and Acting Captain (then Lieutenant) Eugene Kyle.[29] All 3 ratings were endorsed by Captain Larry Bennett. Sergeant Basker's performance evaluation

---

**27.** Of the corporals rated by Lieutenant Kyle that ranked above Corporal Walton, 2 were blacks.

**28.** The performance evaluation done by Sergeant Williams of Corporal Clark on January 19, 1981 was not considered in the November 1981 promotions. Plaintiffs' Exhibit 27.

**29.** The performance evaluation of Corporal Coleman done by Sergeant James Moon on February 5, 1982 was not considered in the November 1981 promotions. Plaintiffs' Exhibit 30.

reveals a score of 540 which placed him 14th of 17 of those officers rated by Sergeant Basker. Sergeant Williams, a black, gave him a 665. That score placed him 13th of 15 of those corporals rated by Norval Williams. Lieutenant Kyle's performance evaluation of Corporal Coleman reveals a score of 700, which Corporal Coleman believes was fair, which placed him 7th of 34 rated by Lieutenant Kyle. All three performance evaluations were marked progressing satisfactorily.[30]

### 10. November 1981 Promotions

There were 55 officers interviewed for sergeant's positions in the fall of 1981.[31] None of the plaintiffs were interviewed because they did not qualify. There were two black corporals interviewed. On October 23, 1981, Chief Daniel Thompson recommended promotion of six officers to the rank of sergeant to the Board of Public Safety apparently in connection with the initiation of the Community Oriented Police Program.[32] At the Board of Public Safety meeting at which these promotions were discussed, Charles Roemer indicated that the Board, in executive session, had discussed the area of promotions and then noted the Board's concern about the minority factors involved and the background of the recommendations. After another executive session, the Board approved the Chief's recommendations.

On November 10, 1981 the Chief of Police again recommended promotions at the South Bend Police Department of various individuals to the ranks of sergeant and lieutenant. After a lengthy discussion about the promotion procedures and minority problems at the South Bend Police Department, the Board approved the promotions of 7 individuals to the rank of lieutenant and 21 individuals to the rank of sergeant. Of the 21 officer promoted to sergeant, 2 were black: Fred Preston and John McCullum, Jr.

### E. Racial Incidents

The occurrence of racial slurs and racially derogatory incidents at the South Bend Police Department have been sporadic and infrequent, particularly when considered in relation to the individual plaintiffs in this case. During the summer of 1980, a piece of paper which appeared to be on police department stationary entitled "Police Entrance Examination (Blacks Only)" was posted on a bulletin board at the South Bend Police Station. The posting of the "exam" was investigated by the Chief of Police Michael Borkowski but its orgin and the identity of the person posting it were never determined.[33] The only other racial incident involving a document was an application for membership to the Ku Klux Klan that was placed in Curtis Walton's pigeonhole at the South Bend Police Station in early 1980. Curtis Walton did not know who put it there. He took the application to Captain Bennett who referred it to Chief Thompson. Chief Thompson said he would fingerprint the paper and try to determine who put it in Corporal Walton's pigeonhole. Upon its return to Corporal Walton, the

---

30. Corporal Coleman had been promoted to the rank of corporal on April 4, 1981.

31. Thirty-one officers, including John McCullum, Jr. and Fred Preston interviewed for positions as detective sergeant. Thirty-three officers interviewed for positions as uniform sergeant. Nine officers were interviewed for both detective sergeant and uniform sergeant.

32. Chief Daniel Thompson indicated in his recommendation of promotion that all of the individuals recommended had completed more than 5 years on the South Bend Police Department and were recommended based on their performance evaluations and oral interviews. Although the Chief noted that all the officer had completed more than 5 years on the force, this does not appear to indicate that that length of service was required to be eligible for promotion to sergeant since James Campbell was promoted to sergeant on November 14, 1981 and he had joined the South Bend Police Department on April 4, 1978.

33. Six of the plaintiffs in this case, all except John Williams and Austin Davis, testified that they had seen this document. This was the only racially related incident that plaintiff Shirley Woods testified about. John Williams did not testify regarding any racial incidents.

application had "blue stuff on it." Its origin was never determined.[34]

In 1980, Chief Daniel Thompson referred to plaintiff Norval Williams as a "nigger" in a derogatory manner at a superior officer's meeting because he was angry at him for not having certain paperwork completed regarding an internal investigation of white police officer accused of using excessive force against a black youth. Chief Thompson apologized to Norval Williams the next day and also apologized to Division Chief Spanward Mitchum who was also in attendance at the meeting.[35]

In 1978 or 1979, Corporal Austin Davis and Sergeant Larry Vergnon, while engaged in the performance of their duties, were involved in an early morning incident at a 24 hour grocery store on South Michigan Street. Sergeant Vergnon called Austin Davis a "nigger" and an argument ensued in which Austin Davis also used derogatory terms in relation to Sergeant Vergnon. Corporal Davis reported the incident to Captain Gish who gave a report to Chief Borkowski. The Chief started an investigation of the incident but could not complete it because Austin Davis would not cooperate. Both Sergeant Vergnon and Corporal Davis were verbally reprimanded.[36]

On November 26, 1981, Lieutenant Eugene Kyle had a conversation with Sergeant Sam Young in which Sergeant Young asked him if he was a part of the Minority Police Officers Association. Lieutenant Kyle stated he was and Sergeant Young stated that he and some of the other white officers on the police department should go out and get some white sheets or robes, place them over their heads, and put on black or blue arm bands around their arms. This conversation took place in response to the article in the "South Bend Tribune" related to the Minority Police Officers Association. This was the only racial incident identified by Lieutenant Kyle.

Sergeant Cullen Walton described two incidents of alleged racially tainted incidents. In 1969, it was brought to his attention that Officer Michael Fulnecky stated that he, Cullen Walton, was driving from the City of Indianapolis like a "nigger" leaving the Indianapolis 500. The only other incident that Cullen Walton knew of occurred in the summer of 1972 when an unidentified officer requested a signal 8, meeting of officers, at the intersection of Falcoon and Western.

Corporal Austin Davis had black gum put in his pigeonhole from 1973 until they moved to sectors. He has had black gum put in his pigeonhole one time, in May 1985, since the sectors had been formed. Corporal Davis also testified regarding racial slurs written on restroom walls from 1973 to 1982, a Ku Klux Klan sign on the wall in the radio room, and several alleged incidents involving Sergeant Julius Halasz using derogatory language in reference to black officers, using excessive force on black and whites in the jail and police bru-

---

**34.** The only other alleged racial incident that was directed at Curtis Walton occurred in 1973 when he was not permitted to become a member of the South Bend Police Department until his partial plate was completed, a requirement not imposed on another white officer joining the department at the same time. He appealed the matter through the Fraternal Order of Police and was given retroactive pay. The decision regarding the partial plate incident was not connected to any of these defendants and there had been a change of administration between the time of this incident and the alleged discriminatory acts of defendants in this case.

**35.** Norval Williams also testified that Chief Thompson verbally abused him in 1981 or 1982 in relation to an incident involving the Chief's secretary. There is no indication that the inci-

dent was racially motivated or that derogatory language was used. Norval Williams was reprimanded for this incident. Although Norval Williams testified that he had been referred to as a "nigger" on a couple of occasions and taken a lot of racial abuse, he only identified two specific incidents: the "Blacks Only Exam" and the incident with Chief Thompson. Division Chief Spanward Mitchum, a black, also identified the "Blacks Only Exam" and the incident between Chief Thompson and Norval Williams as being the only racial incidents he knew about.

**36.** Michael Borowski, while Chief of Police, only specifically knew about this incident and the "Blacks Only Exam", although he testified that he had heard racial slurs at the South Bend Police Department.

tality in connection with a black citizen while making an arrest in 1978. Sergeant Halasz was reprimanded for using excessive force against the black citizen in 1978. Sergeant Halasz did not work with Corporal Davis in the jail. He only received paperwork from Corporal Davis while he was working in the jail. Sergeant Halasz did not use any derogatory language in referring to black officers, including the argument he had with Corporal Davis in December 1981, after the performance evaluations and promotions were completed, regarding Corporal Davis' request to have Christmas Eve off. Further, there was no Ku Klux Klan sign on the wall in the radio room.

In 1979, Hiram Bonds was told to get his "black ass" to the back of the room and sit down by Captain Ernest Dobrzykowski at morning roll call because he was talking to another officer.[37] The only other racial incident described by Corporal Bonds was the "Blacks Only Exam."[38]

Lynn Coleman and James Earl Clark, Jr. testified that they had seen the "Blacks Only Exam." Corporal Coleman testified that Curtis Walton had told him about the Ku Klux Klan application being put in his pigeonhole but did not know of any other racial incidents. Corporal Clark knew of no other racial incidents or slurs involving the defendants.[39]

Daniel Thompson testified that he has used the term "nigger" in referring to blacks during his lifetime. The only incident of Chief Thompson using that term in

relation to his work at the South Bend Police Department was the incident involving Norval Williams.

### III. *Memorandum*

As noted earlier, the plaintiffs in this case have alleged claims under 42 U.S.C. § 1981, the Fourteenth Amendment to the Constitution of the United States, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Because of the different standards and burdens of proof under the different theories, each theory will be discussed separately.

### A. *Fourteenth Amendment to the Constitution of the United States*

■ The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).[40] Thus, in order to prevail on an equal protection claim, a plaintiff must show that defendants acted with a discriminatory purpose or intent. *Id.; Hunter v. Victor Underwood*, — U.S. —, 105 S.Ct. 1916, 85 L.Ed.2d 222 (S.Ct. April 16, 1985); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979); *see General Building Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 390, 102

---

**37.** Captain Dobrzykowski was demoted from Captain to Sergeant on July 4, 1979 and did not do a performance evaluation on any of the plaintiffs in this case in August 1981.

**38.** Corporal Bonds testified that an incident occurred in 1974 involving Chief Thompson, who was then a sergeant, while they were on a call in which Thompson asked some black guys if they liked white women and used the term nigger in the conversation. Chief Thompson did not recall any such incident.

**39.** Corporal Clark testified that in 1979 or 1980, a car was parked outside the police station which contained two young black children and their mother. Two South Bend police officers,

Jeffrey Korros and Patrick Galloway went up to the car and asked the children if they wanted any watermelon and referred to them as "niggers."

**40.** The Due Process Clause of the Fifth Amendment to the Constitution of the United States includes an equal protection component prohibiting the United States from invidious discrimination. *Wayte v. United States*, — U.S. — n. 9, 105 S.Ct. 1524 n. 9, 84 L.Ed.2d 547 (U.S. March 19, 1985); *see Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (private right of action under Fifth Amendment for employment discrimination). *Cf. Huebschen v. Department of Health and Social Services*, 716 F.2d 1167, 1171 (7th Cir.1983).

S.Ct. 3141, 3149, 73 L.Ed.2d 835 (1982).[41] Under the Fourteenth Amendment, discriminatory purpose implies more than intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action in part "because of" not merely "in spite of" its adverse effect upon an identifiable group. *Wayte v. United States,* —— U.S. at ——, 105 S.Ct. at 1532; *Personnel Administrator of Mass. v. Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296. Thus, in order to prevail on a claim under the Fourteenth Amendment, a plaintiff must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual. *Huebchen v. Department of Health and Social Services,* 716 F.2d 1167, 1171 (7th Cir.1983); *Nunn v. City of Chicago,* 603 F.Supp. 1193 (N.D.Ill.1985).

■ The discriminatory purpose or intent under the Fourteenth Amendment may be proven by showing a systematic exclusion of persons because of race or by showing an unequal application of a law, policy or system to such an extent as to show intentional discrimination. *Washington v. Davis,* 426 U.S. at 239, 96 S.Ct. at 2047. However, official action generally will not be held unconstitutional solely because it results in a racially disproportionate impact. *Hunter v. Underwood,* —— U.S. ——, ——, 105 S.Ct. 1916, 1918, 85 L.Ed.2d 222 (1985); *see Personnel Administrator of Mass. v. Feeney,* 442 U.S. at 272, 99 S.Ct. at 2292.[42] A plaintiff must

therefore prove not only unequal treatment of similarly situated persons, he must also prove intent. *Southend Neighborhood Improvement Ass'n v. County of St. Clair,* 743 F.2d 1207, 1212 (7th Cir.1984).

■ In a Fourteenth Amendment case, a plaintiff need not prove that the challenged action rested solely on racially discriminatory purposes. Rather, the plaintiff must show that it was a motivating factor. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 265, 97 S.Ct. at 563; *see Ketchum v. Byrne,* 740 F.2d 1398, 1406 (7th Cir.1984); *Cf. Hunter v. Underwood,* —— U.S. at ——, 105 S.Ct. at 1918; *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977). In determining whether an invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such direct and circumstantial evidence of intent as may be available. *Village of Arlington Heights, supra,* 429 U.S. at 266, 97 S.Ct. at 563. Impact is a starting point and if stark and unexplainable on other grounds, may provide evidence of discriminatory intent or purpose. Other sources of evidence that may shed light on the defendants' motives include the historical background of the decision, the specific sequence of events leading up to the challenged decision, departures from the normal procedural sequence, substantive departures from normal considerations and legislative or administrative history which would include con-

---

**41.** A plaintiff is not required to prove discriminatory intent if the equal protection claim is based on an overtly discriminatory classification. *Wayte v. United States,* —— U.S. at —— n. 10, 105 S.Ct. at 1531 n. 10. Discriminatory classification is not a claim by the plaintiffs in this case.

**42.** The impact on a protected group may be a starting point for determining whether an invidiously discriminatory purpose was a motivating factor, but impact standing alone does not make an action unconstitutional. Impact may demonstrate unconstitutionality because the impact is difficult to explain on other grounds. However, if the impact is explained, discriminatory intent must be proven. *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. at 2048; *Village of*

*Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 266, 97 S.Ct. at 563; *see Flores v. Pierce,* 617 F.2d 1386, 1389 (9th Cir.1980). In *Washington v. Davis,* this issue was an employment test that more blacks than whites failed. The Supreme Court found that the test was constitutional because the plaintiffs failed to show that racial discrimination entered into the establishment or formulation of the test. 426 U.S. at 242, 96 S.Ct. at 2048; *see Personnel Administrator of Mass. v. Feeney,* 442 U.S. at 273, 99 S.Ct. at 2293. This type of analysis has also been used in voter's rights cases involving redistricting. *See, e.g., City of Mobile v. Bolden,* 446 U.S. 55, 66, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980); *Ketchum v. Byrne,* 740 F.2d 1398, 1406 (7th Cir.1984).

temporaneous statements by members of decision making body, minutes of meeting or reports. *Village of Arlington Heights, supra,* at 267–68, 97 S.Ct. at 564–65. Thus, a finding of intentional discrimination must be based on a totality of the circumstances. *See Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).

### B. *42 U.S.C. § 1981*

■ Section 1981 of Title 42 United States Code, provides as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full an equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

This section, like the Fourteenth Amendment to the Constitution of the United States, reaches only purposeful and intentional discrimination. *See, e.g., General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 389–91, 102 S.Ct. 3141, 3149–50, 73 L.Ed.2d 835 (1982); *Movement for Opportunity, Etc. v. General Motors,* 622 F.2d 1235, 1256 (7th Cir.1980); *Mescall v. Burrus,* 603 F.2d 1266, 1269–71 (7th Cir.1979); *Zewde v. Elgin Community College,* 601 F.Supp. 1237, 1249 (N.D.Ill. 1984).[43] Accordingly, the showing by disparate impact alone is insufficient to prove a claim of employment discrimination under § 1981: there must be a showing of discriminatory intent.[44]

In analyzing and evaluating an employment discrimination claim under § 1981, a court may use the order of proof, standards and inferences used in a disparate treatment case under Title VII in appropriate cases. *See, e.g., Mason v. Continental Illinois National Bank,* 704 F.2d 361, 364 (7th Cir.1983); *Movement for Opportunity, Etc. v. General Motors,* 622 F.2d at 1256; *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1281 n. 3 (7th Cir.1977); *Flowers v. Abex,* 580 F.Supp. 1230, 1232 (N.D.Ill.1984). However, the format described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny, is not rigid, mechanized or ritualistic but merely provides the court with a way to evaluate evidence as it bears on the issue of discrimination. *Mason v. Continental Illinois National Bank,* 704 F.2d at 365.[45] The central focus at all times must be on whether the employer is treating some people less favorably because of their race. *See Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Thus, in order to prevail on a § 1981 claim, the plaintiff must show that but for race, he would have been promoted, etc. *See Warfield v. Adams,* 582 F.Supp. 111, 118 (S.D.Ind.1984).

### C. *Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.*

Two of the plaintiffs in this consolidated case, James Earl Clark, Jr. and Lynn Coleman, have alleged claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* on the ground that defendants have discriminated against them on

---

**43.** The same basic standard, purposeful or intentional discrimination, is also applicable to cases brought under 42 U.S.C. § 1983 on equal protection grounds. *Firefighters Local Union, No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 2590 n. 16, 81 L.Ed.2d 483 (1984); *Parker v. Board of School Commissioners of City of Indianapolis,* 729 F.2d 524, 528 (7th Cir.1984); *Mescall v. Burrus,* 603 F.2d 1266, 1270–71 (7th Cir. 1979); *Zewde v. Elgin Community College,* 601 F.Supp. 1237, 1247 (N.D.Ill.1984).

**44.** As with cases of discrimination under the Fourteenth Amendment, if the impact on the

protected group is stark and not explained on legitimate reasons, the necessary intent may be inferred on the impact alone.

**45.** In a factory setting, the format set out in *McDonnell Douglas* raises an inference of discrimination. However, when a managerial position is involved, the same inference does not necessarily follow because an employer will want to get the most qualified person to fill the position. See section C of part II of this opinion.

the basis of race. In support of those claims, the plaintiffs maintain that they are entitled to relief under Title VII on alternative theories: disparate impact and disparate treatment. The Supreme Court of the United States has distinguished between these two types of Title VII cases, *see, e.g., United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 713 n. 1, 103 S.Ct. 1478, 1481 n. 1, 75 L.Ed.2d 403 (1983); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), and has enunciated different standards of proof for the two theories. *Cf. Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Accordingly, each theory will be discussed separately.

### 1. *Disparate Impact*

■ Under the disparate impact theory of discrimination in Title VII cases, a plaintiff can establish a prima facie case of discrimination by showing that the standards, policy, or practice in question, though facially neutral and even neutral in intent, operate in a discriminatory manner, i.e., disproportionately exclude the minority from promotion, training, assignment, etc. Once the plaintiff has met this burden, the defendant must show that the requirement or policy has a manifest relationship to the employment in question. If the employer shows that the policy is job related, then the burden shifts back to the plaintiff to show that other devices without a similar discriminatory impact would serve the employer's legitimate interests. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Caviale v. State of Wisconsin, Dept. of Health and Social Services*, 744 F.2d 1289 (7th Cir. 1984); *League of Martin v. City of Milwaukee*, 588 F.Supp. 1004, 1013 (E.D.Wisc. 1984). There is no need to show intent under the impact thereof. *Teamsters v.*

*United States*, 431 U.S. 324, 336 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Griggs v. Duke Power Co.*, 401 U.S. at 432, 91 S.Ct. at 854.

■ This theory of proof under Title VII is intended to identify artificial, arbitrary and unnecessary barriers to employment when those barriers operate invidiously to discriminate on the basis of racial or other impermissible classification *Teamsters, supra*, 431 U.S. at 331, 97 S.Ct. at 1852. Title VII does not require that plaintiff be hired, promoted, etc. because he was subject to past discrimination or because he is a member of a minority group. It only requires that minorities not be discriminated against because of their race. Under the impact theory, the touchstone is business necessity. Thus, a measuring device, such as a test or performance evaluation does not violate Title VII if they are a reasonable measure of job performance. *Griggs, supra*, 401 U.S. at 436, 91 S.Ct. at 856.

■ Statistics may be used to prove discrimination under the disparate impact theory but it is essential that the correct statistics be used in the analysis. *See Liberles v. County of Cook*, 709 F.2d 1122 (7th Cir.1983). In employment discrimination cases, the composition of the work force rather than population as a whole is the standard to be employed, *see Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), and qualifications may be essential factors when upper level jobs are at issue. *See Metrocare v. Washington Metropolitan Area Transit Authority*, 679 F.2d 922 (D.C.Cir.1982); *Rivera v. City of Wichita Falls*, 665 F.2d 531, 541 (5th Cir.1982). In determining the correct comparison pool, only the minimum objective qualifications, not subjective qualifications, are relevant. *Caviale, supra*, at 1293–94. Further, in order to establish a prima facie case of discrimination under disparate impact, the plaintiff must show that the application of the policy resulted in a significant discrimi-

natory pattern. *See Dothard v. Rawlinson*, 433 U.S. at 329, 97 S.Ct. at 2726.[46]

### 2. *Disparate Treatment*

■ In Title VII cases based on disparate treatment, unlike disparate impact, proof of discriminatory intent is critical. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Accordingly, the analysis used in disparate treatment cases is somewhat different than that used in disparate impact cases.[47] The factual inquiry in this type of Title VII case is whether the defendant intentionally discriminated against the plaintiff, *United States Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), and the plaintiff has the ultimate burden of showing intentional discrimination, i.e. that the employer was treating some people less favorably than others because of race, color, religion, sex or national origin. *Burdine, supra,* at 253, 101 S.Ct. at 1093; *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *Teamsters, supra,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854; *Nellis v. Brown County*, 722 F.2d 853, 856 (7th Cir.1983).[48]

■ In a disparate treatment case, the plaintiff must prove a prima facie case by a preponderance of the evidence. To do so, the plaintiff must show that he was a member of a minority, applied for an available position for which he was qualified and was rejected under circumstances which give rise to an inference of unlawful discrimination. *See, e.g., Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973).[49] The prima facie showing by the plaintiff raises an inference of unlawful discrimination only because of a presumption that these acts otherwise unexplained are more likely than not based on impermissible factors. *Furnco Construction Corp. v. Waters*, 438 U.S. at 577, 98 S.Ct. at 2949; *Teamsters v. United States*, 431 U.S. at 358 n. 44, 97 S.Ct. at 1866 n. 14. If the plaintiff establishes a prima facie case, a rebuttable presumption arises that the defendant unlawfully discriminated against the plaintiff and the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for defendants employment action. *Furnco Construction Corp. v. Waters, supra; Board of Trustees of Keene State College v. Sweeney, supra.* In articulating its reasons, the defendant must be clear and reasonably specific though he need not convince the court that he was actually motivated by those reasons. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 254, 101 S.Ct.

**46.** If the statistics presented with respect to impact only show a slight disparity or none at all those statistics may be more probative of an absence of discrimination. *See E.E.O.C. v. Federal Reserve Bank*, 698 F.2d 633, 662 (4th Cir. 1983).

**47.** The general framework of the liability portion of disparate treatment class action or government case is essentially comparable to the framework for a private non-class Title VII case although the content of the specific stages in the framework may be different. *Coates v. Johnson & Johnson*, 756 F.2d 524, 532 (7th Cir. 1985).

**48.** The ultimate fact of discrimination, i.e., whether a defendant violated Title VII, involves

both a finding of fact and conclusion of law. *Nellis v. Brown County*, 722 F.2d at 859.

**49.** In *McDonnell Douglas*, the Supreme Court described the last element as requiring a showing that "after his rejection, the position remained open and the employer continued to seek applicants from persons of complainants qualifications." 411 U.S. at 802, 93 S.Ct. at 1824. The Court noted, however, that the standard was not inflexible and that the facts a plaintiff must show to be entitled to an inference of discrimination will vary depending upon the type of employment practice involved. *Id.* at 803 n. 13, 93 S.Ct. at 1824 n. 13; *see, e.g., Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253–54 n. 6, 101 S.Ct. at 1093–94 n. 6.

at 1094; *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. at 25, 99 S.Ct. at 295; *Nellis v. Brown County,* 722 F.2d at 856.[50] If the defendant carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for its discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093; *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577–78, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Coates v. Johnson & Johnson,* 756 F.2d 524, 530–31 (7th Cir.1985). A plaintiff can show the stated reasons were a pretext by evidence that nonminorities were not rejected for the same reasons. Other relevant evidence might include the defendant's treatment of plaintiff prior to the complained of action and the defendant's general policy and practice with respect to minorities. Further, statistics and racial slurs may be used to show pretext. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 804, 93 S.Ct. at 1825; *Rowe v. Cleveland Pneumatic Co., Numerical Control,* 690 F.2d 88 (6th Cir.1982). The showing by plaintiff of pretext merges with his ultimate burden of persuading the court that he was a victim of intentional discrimination. *Burdine, supra; see Unit-*

ed States Postal Service Bd. of Governors v. Aikens,* 460 U.S. at 716, 103 S.Ct. at 1483.[51]

### D.  *Working Conditions*

■ Title VII also protects the relationship between an employee and his working environment, *see Rogers v. E.E.O.C.,* 454 F.2d 234, 238 (5th Cir.1971), and an employer can therefore violate Title VII simply by creating or condoning an environment at the workplace which significantly and adversely affects the psychological well being of an employee because of his or her race, sex or ethnicity, regardless of any other tangible job detriment. *See, e.g., Rowe v. Cleveland Pneumatic Co., Numerical Control,* 690 F.2d 88, 97 (6th Cir.1982); *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1358 (11th Cir.1982); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir. 1981); *Bundy v. Jackson,* 641 F.2d 934, 943 (D.C.Cir.1981); *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir.1977); *Rogers v. E.E.O.C., supra,* at 238; *Pierson v. Norcliff Thayer, Inc.,* 605 F.Supp. 273, 277 (E.D.Mo.1985); *Zabkowicz v. West Bend Co.,* 589 F.Supp. 780, 783 (E.D.Wisc.1984); *Johnson v. Jos. Schlitz Brewing Co.,* 581 F.Supp. 338, 345 (M.D.N.C.1984); *E.E.O.C. v. Murphy Motor Freight Lines, Inc.,* 488 F.Supp. 381, 384 (D.Minn.1980); *cf. Howard v. National Cash Register Co.,* 388 F.Supp. 603 (S.D. Ohio 1975).[52] To rise to the level of a Title

---

**50.** Although a defendant must articulate legitimate, nondiscriminatory reasons, he is not required to prove those reasons by underlying acts. *Burdine, supra,* at 258, 101 S.Ct. at 1096. Further, a defendant is not required to hire or promote the most qualified but rather is only required to make the choice for nondiscriminatory reasons. *See, e.g., Mason v. Continental Illinois National Bank,* 704 F.2d 361 (7th Cir. 1983). Nor is an employer required to maximize the number of minorities hired or promoted. *See Burdine, supra,* 450 U.S. at 259, 101 S.Ct. at 1096. Furthermore, a racially balanced workforce cannot immunize an employer for specific acts of discrimination since Title VII provides an equal opportunity for each individual regardless of race. *Furnco Construction Corp. v. Waters,* 438 U.S. at 579, 98 S.Ct. at 2950.

**51.** Mere conclusory allegations of discrimination are not sufficient to withstand a motion for

summary judgment, *Mason v. Continental Illinois National Bank,* 704 F.2d at 367, so they are clearly not enough to prove the ultimate question of discrimination.

**52.** The relationship between the employee and his working environment is encompassed within the "terms, conditions or privileges of employment" language of Title VII. Section 1981 of Title 42 United States Code is not specifically addressed to employment discrimination and this court has found no cases that indicate a plaintiff can state a claim under § 1981 based on working conditions alone. However, conditions in the workplace, including racially derogatory slurs and incidents may be used to show discriminatory intent. Nor has the court found any cases indicating that such a claim can be stated under the Fourteenth Amendment.

VII violation, the working environment must be dominated by racial slurs, i.e., the derogatory comments must be excessive and at an opprobrious level, so as to alter the conditions of employment and create an abusive working environment. *See, e.g., Walker v. Ford Motor Co.,* 684 F.2d 1355, 1359 (11th Cir.1982); *Cariddi v. Kansas City Chief Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir.1977). However, neither racial comments that are merely part of casual conversation, nor infrequent, sporadic, accidental racial comments or epithets even if they engender offensive feelings in an employee, rise to the level of a Title VII violation-more than a few isolated incidents of harassment must have occurred to prove a claim under Title VII based on working conditions. *See Walker v. Ford Motor Co.,* 684 F.2d at 1359; *Johnson v. Bunny Bread Co.,* 646 F.2d at 1257; *Pierson v. Norcliff Thayer, Inc.,* 605 F.Supp. at 277; *Johnson v. Jos. Schlitz Brewing Co.,* 581 F.Supp. at 345.[53] Thus, a court is dealing with degrees in determining whether a plaintiff has proven that the racially derogatory comments have created a psychologically damaging environment.[54]

■ Further, in order to hold an employer liable under Title VII for actions of a supervisor or co-worker, a plaintiff must show that the employer knew or should have known of the harassment but failed to take immediate and appropriate corrective action. *Henson v. City of Dundee,* 682 F.2d 897 at 905 (11th Cir.1982); *Zabkowicz v. West Bend Co.,* 589 F.Supp. at 784; *E.E.O.C. v. Murphy Motor Freight Lines, Inc.,* 488 F.Supp. at 385; *see Bundy v.*

*Jackson,* 641 F.2d at 943; *Barnes v. Costle,* 561 F.2d 983 (D.C.Cir.1977); *Johnson v. Jos. Schlitz Brewing Co.,* 581 F.Supp. at 345. An employee can demonstrate that an employer knew of the harassment by showing plaintiff complained to higher management or by showing the pervasiveness of the harassment which gives rise to the inference of knowledge or constructive knowledge. *See Henson v. City of Dundee,* 682 F.2d at 905; *Bundy v. Jackson,* 641 F.2d at 943; *Taylor v. Jones,* 653 F.2d 1193, 1199 (8th Cir.1981); *E.E.O.C. v. Murphy Motor Freight Lines, Inc.,* 488 F.Supp. at 385–86.

In addition to showing a violation of Title VII based on working conditions, evidence of racially derogatory remarks, slurs or actions may be relevant and probative evidence in support of a plaintiff's *prima facie* case of discrimination or to show that a defendant's proffered reason was a pretext. *See, e.g., Rowe v. Cleveland Pneumatic Co., Numerical Control,* 690 F.2d at 97; *Pierson v. Norcliff Thayer, Inc.,* 605 F.Supp. at 277; *Johnson v. Jos. Schlitz Brewing Co.,* 581 F.Supp. at 345. Again, however, whether any such statements on the part of defendants establish a racial bias, prejudice or animus is a matter of degree. *See Johnson v. Jos. Schlitz Brewing Co.,* 581 F.Supp. at 345.

## IV. *Conclusions of Law*

■ As noted in the preceding sections of this opinion, the plaintiffs must prove that the defendants intentionally and purposefully discriminated against them in order to recover on their claims either under

---

**53.** The fact that racially derogatory slurs are not directed at the plaintiff is not determinative. Incidents of offensive language used in plaintiff's presence is also probative evidence of a workplace environment that violates Title VII. *Walker v. Ford Motor Co.,* 684 F.2d at 1359 n. 2.

**54.** *Cf. Walker v. Ford Motor Co.,* 684 F.2d at 1359 (racially abusive language was repeated, continuous and prolonged despite plaintiff's objections and violated Title VII); *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982) (subjected to crude and vulgar language almost daily; Title VII violated); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir.1981) (use of racial terms, if any, was infrequent, limited to casual

conversation; no Title VII violation); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981) (improper sexual advances to females was "standard operating procedure, a fact of life, a normal condition of employment"; Title VII violation); *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87 (8th Cir.1977) (no Title VII violation; two incidents in casual conversation); *Zabkowicz v. West Bend Co.,* 589 F.Supp. 780 (E.D.Wisc. 1984) (sustained, malicious, and brutal harassment: Title VII violated). *But see Bailey v. Binyon,* 583 F.Supp. 923 (N.D.Ill.1984) (incidents of racial slurs under different standard in constructive discharge case).

42 U.S.C. § 1981 or the Fourteenth Amendment. The two plaintiffs that have alleged Title VII violations as well need only show intentional discrimination under the disparate treatment theory, not the impact theory. The plaintiffs have failed to prove that they have been discriminated against under any theory on any of their claims.[55]

## A. *Training*

There is no evidence in this case that any of the plaintiffs requested to attend a particular outside training program and was not chosen to do so under circumstances giving rise to an inference of discrimination. Nor have the plaintiffs presented any statistics on attendance at outside training schools. The only evidence presented by plaintiffs contained information regarding attendance by officers of the South Bend Police Department, besides the testimony of the plaintiffs themselves, were the minutes of the Board of Public Safety meetings for December 1979 through March 1982. Those minutes reflect that 69 identified officers attended outside training and 3 of those were blacks. Those minutes reflect that another 25 to 30 officers attended outside training but those individuals were not identified nor was the racial composition of the group disclosed. Further, the testimony of the plaintiffs indicate that Corporal Shirley Woods, Corporal

James Earl Clark, Jr., and Acting Lieutenant Norval Williams have attended outside training although no time frame was established. Based on this evidence, the court cannot conclude that the impact on blacks was so stark as to raise even an inference of discriminatory intent on the part of the defendants.[56]

Furthermore, other evidence of discriminatory intent or purpose with respect to the decisions of which officers were selected to attend outside training is not present in this record. The evidence indicates that the Chief of Police decides who will attend outside training based on the needs of the individual officers and the South Bend Police Department as a whole in relation to available outside training programs, and that the Board of Public Safety approved the Chief's recommendations during the relevant time period. There is no evidence of any deviation from this procedure nor the substantive considerations underlying the decisions. Further, the minutes reflect the concern of the Board of Public Safety regarding the attendance of blacks at outside training schools and the alleged racial incidents and slurs were in no way connected to decisions regarding attendance at outside training schools. Accordingly, the plaintiffs have failed to prove that they were intentionally and purposely discriminated against on the basis of their race

---

**55.** The Minority Police Officers Association, as an unincorporated association, can sue and be sued in its common name. Fed.R.Civ.Proc. 17(b); *see* Indiana Rule of Trial Procedure 17(e). In this case, the Association is suing as a representative of its members and has not alleged any violation of its own rights.

**56.** The usefulness of statistical evidence depends upon the circumstances of the particular case. *See, e.g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *Herman v. National Broadcasting Co., Inc.* 744 F.2d 604, 605, 610 (7th Cir.1984). Statistics can be an effective means of measuring the cumulative effect of employment actions and statistically significant disparities in the treatment of comparably situated persons are often quite probative of unlawful discrimination. *Mozee v. Jeffboat, Inc.,* 746 F.2d 365, 372 (7th Cir.1984); *see Coates v. Johnson & Johnson,* 756 F.2d 524 (7th Cir.1985).

However, the difficulties of showing comparability of situations is a significant limitation. *Id.*

Furthermore, the statistics presented must be appropriate and relevant, i.e., the sample must be adequately large to allow the results of the sample to be meaningful and the sample must be compared to the relevant pool for that sample. *See Hazelwood School Dist. v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Mayor of City of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); *Coates v. Johnson & Johnson, supra; Miles v. M.N.C. Corp.,* 750 F.2d 867 (11th Cir.1985); *Soria v. Ozinga Bros., Inc.,* 704 F.2d 990 (7th Cir.1983); *Stewart v. General Motors Corp.,* 542 F.2d 445 (7th Cir.1976). The plaintiffs in the case before the court have not presented any statistical evidence regarding the relevant pools and/or samples such that the court finds them useful or probative in this case.

with respect to training in violation of the Fourteenth Amendment to the Constitution of the United States or 42 U.S.C. § 1981.

Nor have plaintiffs Lynn Coleman or James Earl Clark, Jr. proved a violation of Title VII with respect to the outside training aspect of employment at the South Bend Police Department, either under the disparate impact theory or disparate treatment theory. Neither of these plaintiffs have even shown a *prima facie* case under the disparate treatment analysis so as to give rise to an inference of discrimination. Furthermore, the evidence indicates that officers are chosen to attend outside training programs based on individual need for training or general need of the South Bend Police Department for training and availability of such training, thus indicating a legitimate, nondiscriminatory reason for its decision. The plaintiffs have not shown that these reasons were a pretext for discrimination. Nor have the plaintiffs shown that the use of outside training selection procedure has resulted in a significant, disproportionate, discriminatory pattern of excluding blacks from attendance. Accordingly, Lynn Coleman and James Earl Clark, Jr. have failed to prove the defendants have violated Title VII with respect to training.

### B. *Assignment*

The plaintiffs have also failed to show that they have been intentionally and purposefully discriminated against with respect to assignment at the South Bend Police Department. Although the evidence indicates that there were certain areas or shifts in the Department where there were no blacks assigned at one time or another, there is no evidence that blacks were not assigned to those positions because of any discriminatory intent on the part of the defendants. In fact, the evidence indicates

the lack of discriminatory intent. Blacks have been requested to apply for some of those areas and have declined to do so because of the nature of the particular assignments. Further, the only evidence in this case regarding requests for a particular assignment that were denied were applications by Corporal Lynn Coleman and Corporal James Earl Clark, Jr. for a position in the homicide until in April 1985 and there is no evidence from which a discriminatory intent or purpose can be attributed to the defendants in this case in their decision to choose Corporal Charles Eakins to fill that position.[57] Accordingly, the plaintiffs have failed to prove that the defendants discriminated against them with respect to the assignment aspect of employment at the South Bend Police Department in violation of the Fourteenth Amendment to the Constitution of the United States, 42 U.S.C. § 1981 or Title VII.

### C. *Working Environment*

Plaintiffs Lynn Coleman and James Earl Clark, Jr. have failed to prove that the defendants have created or condoned an environment at the workplace which significantly and adversely affected their well being as a police officer in violation of Title VII.[58] Corporal Coleman identified the "Blacks Only Exam" and testified that Curtis Walton had told him that he had gotten the Ku Klux Klan application in his mailbox. Corporal Clark also identified the "Blacks Only Exam" and related one other racial incident that did not occur in his presence, was not directed at him nor in any way related to his position as an officer with the South Bend Police Department. Further, none of the other racial incidents described by the other plaintiffs in this case relate in any way to these two officers. Accordingly, Corporal Coleman

---

**57.** The evidence in this case indicates that there were 23 applicants for this position. There is no evidence of the required qualifications, if any, for the position nor any evidence of the respective qualifications of the various applicants. None of the evidence of racial slurs and incidents in this case was related to this decision: none of those described occurred in 1985

nor were any attributable to the decisionmakers in this instance.

**58.** The other plaintiffs in this case have only alleged claims under 42 U.S.C. § 1981 and the Fourteenth Amendment. Adverse working conditions cannot support a claim under either of these two provisions although such evidence can be used to show intent.

and Corporal Clark have failed to prove a violation of Title VII based on an abusive working environment.

### D. *Promotion*

The plaintiffs' claims that the defendants have discriminated against them in promotions is equally without merit under the facts of this case. Although the plaintiffs have submitted several arguments in support of their claim of discrimination in promotion, they have failed to prove that they were victims of intentional and/or purposeful discrimination with respect to the November 1981 promotions.

The main focus of plaintiffs' claim of discrimination in promotion is on the performance evaluation stage of the "in-house" promotion plan. First, plaintiffs claimed that blacks were rated on a different and disparate basis than whites seeking promotion with respect to the performance evaluations. The evidence reveals that all officers were rated on their performance using the same evaluation form, with the same factors, following the same instructions, considering the same criteria and that the same procedure was followed in determining the particular raters for each individual. Further, the same procedure was followed in determining which individuals were eligible for the oral interview stage, i.e., the top 10% of the detail, and that the same questions were asked of those being interviewed for the particular position. There are no allegations nor any evidence that there were any deviations from the standard procedure with respect to the recommendations made by the oral interview boards nor the Chief of Police. Accordingly, there is no evidence of an unequal application of the in-house promotion procedure that would indicate discrimination.

Plaintiffs maintain, however, that the rating of the individual officers was subjective and the possibility of manipulation of the performance evaluation, despite the listing of objective factors, made the performance evaluation process a vehicle for discrimination. The plaintiffs further maintain that they have shown that these defendants intentionally discriminated against them by showing that they were rated lower than whites and that the evidence of racial slurs and incidents are direct evidence of the discriminatory intent. This argument contains several flaws.

First, the evidence of racial slurs and incidents were not in any way connected to the November 1981 promotions nor, in fact, any promotions. Second, the racial incidents and slurs were not connected to these defendants except the one incident involving Chief Thompson and Sergeant Williams. Third, the plaintiffs have failed to show how the racial incidents and slurs can be the basis for imputing a discriminatory intent to these defendants. The evidence shows that many of the racial incidents occurred and were brought to the attention of the Chief, an investigation was done and appropriate action was taken so there is no ground upon which to base a practice or policy claim.[59]

Further, there is no evidence in this case of any manipulation of the performance evaluations nor that any of the raters considered any factors or criteria outside of those listed on the form and in the instructions, including race, in making their evaluations. Nor is there any evidence that the performance evaluation procedure was designed or implemented in such a manner so as to have an adverse effect upon blacks seeking promotion at the South Bend Police Department. Further, the factors considered in the performance evaluation were largely objective and the requirement that any deviation from a rating of 3 on any factor precluded their susceptibility to discriminatory abuse. *Cf. Paxton v. Union National Bank*, 688 F.2d 552, 563 n. 15 (8th Cir.1982); *Coble v. Hot Springs*

---

59. Although a long standing pattern or practice of treating a protected group differently may show discriminatory intent, *see Minority Police Officers Ass'n v. City of South Bend*, 721 F.2d 197, 201 (7th Cir.1983); the plaintiffs have not presented any evidence of such practice in this case with respect to any of the aspects of employment involved in this case.

*School Dist. No. 6*, 682 F.2d 721, 726 (8th Cir.1982).

The plaintiffs' next argument is that the rating system was dominated and controlled by white supervisors and that the existing racial imbalance at the supervisory level of the South Bend Police Department itself precluded blacks from being considered equally with whites for promotion. This argument rests on a presumption that all whites are prejudiced and discriminate against blacks and the law on employment discrimination has not recognized any such presumption or inference. Thus, for this court to find discrimination in promotion in this case based on this rationale would require the court to completely ignore the law setting forth the tests for discrimination outlined above and this court declines to do so. The burden is on the plaintiffs to prove intentional discrimination by admissible evidence and not on the defendants to prove the opposite.

The plaintiffs have not provided the court with statistics that show a significant disparity in advancement rates between blacks and white in the November 1981 promotions. The evidence indicates that two black corporals and 19 white corporals were promoted to the rank of sergeant in November 1981. However, to determine the disparity requires a comparison of the numbers promoted with the number of individuals eligible for promotion and the plaintiffs have not provided the court with the number of individuals eligible nor the information necessary to determine the relevant pool of qualified candidates. Accordingly, the plaintiffs cannot rely on statistical evidence to support their claims of intentional discrimination.

Nor does evaluating the evidence under the *McDonnell Douglas* format assist the plaintiffs in proving their claims of intentional discrimination in promotion. They have all proved that they were members of

a minority and the court will assume that they have shown that they were all qualified for promotion.[60] They have not proven, however, that they were not promoted under circumstances that give rise to an inference of discrimination. There is no evidence in this case that those officers that were promoted in November 1981 were less qualified than plaintiffs or that there were any deviations from the procedure outlined in the "in-house" plan. However, even if this court assumes that the plaintiffs have proven a *prima facie* case the defendant have articulated a legitimate, nondiscriminatory reason for not promoting these plaintiffs: they did not rank high enough on their performance evaluations to qualify for further consideration for promotion. The burden therefore shifts back to the plaintiffs to prove the reason given was merely a pretext for discrimination, a showing that merges with their ultimate burden of persuading the court that they were victims of intentional discrimination.

The plaintiffs maintain that they have shown the reasons were a pretext by the following "facts": (1) the defendants tried to restrict the evidence to two years; (2) the questionable credibility of defendants' witnesses; (3) unsatisfactory explanation of the whereabouts of performance evaluations done on plaintiffs prior to 1981; and (4) the questionable accuracy of the defendants offered exhibits G through M, O, P, and R. These "facts", even if supported by the record which they are not, do not show that the reasons were a pretext for discrimination. Nor is there any other evidence in this case that indicates that the reasons were a pretext.

Finally, considering the evidence as it relates to the plaintiffs individually further indicates their failure to prove that these defendants intentionally discriminated against them in promotion.[61] Sergeant

---

**60.** This assumption, however, does not have a firm foundation in the evidence in this case. Corporal Lynn Coleman's and Corporal Shirley Woods' performance evaluations indicate that they were "progressing satisfactorily: and Cor-

poral Austin Davis' was marked "not qualified for promotion."

**61.** It is not exactly clear from this record upon what theory the plaintiffs were relying to impose liability on the various defendants in this

Norval Williams was rated by two individuals on his performance with respect to the November 1981 promotions and one of those raters was Lieutenant Eugene Kyle, a black. Sergeant Williams testified that Lieutenant Kyle's rating was fair. That rating placed him 5th of 5 sergeants rated by Lieutenant Kyle and this rating alone would have kept Sergeant Williams from qualifying for an oral interview, the next step in the promotion process. Accordingly, Sergeant Norval Williams has failed to show that these defendants intentionally discriminated against him with respect to the November 1981 promotions. Corporal Lynn Coleman's claim must fail for the same reason. Corporal Coleman was rated by Sergeant Norval Williams and Lieutenant Eugene Kyle. Both noted that he was progressing satisfactorily but neither indicated he was qualified for promotion. Corporal John Williams was also rated by Lieutenant Kyle and his rating placed him 2nd of 29 corporals. Sergeant Sam Young's rating placed him 2nd of 14 but Sergeant Fautz's ranking of 7th of 13 kept Corporal Williams from placing in the top 10% of his detail. Corporal Williams complained about Sergeant Fautz rating him because he had not worked with him very long but there was no evidence that Sergeant Fautz's rating was lower because of race.

Corporal Curtis Walton was also rated by Lieutenant Eugene Kyle whose rating placed him 18th of 29, which score alone would have kept Corporal Walton from qualifying for an oral interview. Further, Corporal Walton believed that the 2 whites who rated him gave him low scores basically because whites are prejudiced and want to keep blacks second class citizens. Mere conclusory allegations of discrimination are clearly not sufficient to prove discriminatory intent. *See Mason v. Continental Illinois National Bank*, 704 F.2d 361, 367 (7th Cir.1983). Corporal Shirley Woods' and Corporal Hiram Bonds' claims are also

based on conclusory allegations and must also fail for the same reason.

Corporal James Earl Clark, Jr. thought his raters rated him low because of personality conflicts and his attitude problems. Thus, Corporal Clark's main allegations do not even focus on any discriminatory intent on the part of his raters.

The last named individual plaintiff, Austin Davis, has also failed to prove that the defendants intentionally discriminated against him on the basis of race. Corporal Davis identified some racial incidents involving one of his raters, Sergeant Julius Halasz. The record indicates, however, that Corporal Davis would not have qualified for an oral interview even without considering Sergeant Halasz's evaluation. Corporal Davis was not qualified for promotion because of his job performance.

Nor does the evidence show that these defendants discriminated against James Earl Clark, Jr. or Lynn Coleman in violation of Title VII. There is no statistical evidence that shows a disparate impact on an identified protected group nor have these plaintiffs shown the necessary intent under the disparate treatment theory.

Finally, the Minority Police Officers Association has failed to show that it is entitled to any relief. It has not alleged any injury to itself so its claim must necessarily have been based on the claims of its members. The Association has not presented any evidence, other than that presented by the other named plaintiffs in this case.

For all of the foregoing reasons, the plaintiffs have failed to prove that they are entitled to any relief on any of their claims. Judgment shall be entered for Defendants. SO ORDERED.

---

case, particularly in light of limited application of the respondeat superior theory under § 1983 claims. However, this court need not address this issue in light of the plaintiffs' failure to show that they were discriminated against in any aspect of employment at the South Bend Police Department.